**People of the State of Illinois, Plaintiff-Appellee, v. Sylvester Lewis, Defendant-Appellant.**

**Gen. No. 50,274.**

First District, Second Division.

March 5, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Frederick F. Cohn and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Barth H. Goldberg, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

In a jury trial, the defendant, Sylvester Lewis, was convicted of burglary and judgment was entered accordingly. After motions for a new trial and in arrest of judgment were denied, he was sentenced to five (5) to fifteen (15) years in the Illinois State Penitentiary. He appeals.

In the early morning hours of August 26, 1963, a television and radio shop at 122 East 43rd Street in Chicago, Illinois, was burglarized. Mr. Jimmy Luckett testified that he was the proprietor and had left the premises just a few hours before, locking the front door as well as the iron gate at the rear entrance to his store. He explained that he had placed an iron bar across the inside of the rear door before he locked it.

At approximately 3:00 a. m. on August 26, 1963, Mr. Luckett returned to his place of business, in response to a police message that his store had been broken into. He testified that unlawful entry had been effected only through the rear door as someone had pried open the lock on the iron gate and had punched a hole through the rear door which also served to lift up the iron bar. He went on to say that his rear door was located in a long, dark passageway leading to the alley and no one could see his rear entrance from 43rd Street itself. He remembered that upon arriving at the scene he noticed an apparently abandoned Buick automobile in the alley and in it were some of his television sets and radios. He also noticed other television sets of his in the alley itself near the car and in the wide passageway connecting the rear of his store to the alley.

Officer Alvin Daniels also testified for the prosecution and stated that in the early morning hours of August 26, 1963, he and his partner, in a squad car, went into the aforementioned alley on a routine patrol. The alley it-

465

self was illuminated by few lights but the squad car's headlights brought into view an open car trunk. Sensing a crime in progress, Officer Daniels' partner turned on the police vehicle's spotlight, and Officer Daniels, who was sitting in the front seat of the squad car on the right-hand side, saw that a man, carrying a television set, was approaching the other car. The offender was looking directly into the glare of the police car's spotlight and headlights, and Officer Daniels was able to look at him directly for a few moments at a distance of approximately twenty to forty-five feet, before he dropped the television set and fled, and was not apprehended that night.

Officer Daniels went on to testify that the abandoned vehicle, with television sets and radios in it, was a 1958 Buick hardtop. The police officer concluded his testimony on direct examination by stating that before becoming a police officer, he had been a practitioner in the field of mortuary science and had taken courses studying physical profiles and human faces. He observed the defendant that morning in the alley and had an opportunity to get a front view of his face. He then identified the defendant in the courtroom as the man he had seen in the alley, as well as the man he had seen in December 1963, when the defendant, after his arrest, was brought from the lockup, by himself, to be identified by Officer Daniels.

On cross-examination, Officer Daniels testified that when he saw the defendant in the glare of the spotlight and headlights, the defendant was approximately twenty, thirty, to forty-five feet from him and he was able to observe him for moments.

Detective Otto McCollum testified for the State that he was a burglary detective assigned to this case. He investigated the ownership of the abandoned 1958 Buick automobile and found a Mr. Luther Lewis to be the title owner. Upon talking to Mr. Luther Lewis, Detective McCollum determined that the son of Mr. Lewis, Sylvester

Lewis, actually had sole possession of this car. The detective then placed a stop order at Police Headquarters against the defendant for suspected burglary.

The defendant's father, Luther Lewis, was called as a State's witness and testified that, prior to the date of the burglary, he had bought a 1958 Buick hardtop auto for his son, Sylvester, to drive as he, Luther Lewis, did not drive. When asked about the signed statement he had given Detective McCollum in the police station on March 25, 1964, allegedly implicating his son in the burglary, Mr. Luther Lewis testified that his memory was now faint and he had been under a doctor's care for heart trouble and nervousness. Pursuant to his oral request, his signed statement was read to him by the State's Attorney out of the jury's presence, and when the jury returned, Mr. Luther Lewis testified in accordance with the written statement he had given Detective McCollum. His testimony was as follows:

> "On August 26, 1963, I had a conversation with my son in which he said he and others had broken into a record shop and they stole some radios and what-not and they were in the car. He asked me if I would turn in a report that the car was stolen, and I said no."

Officer Mucharski called as a witness for the State, stated that he and his partner were investigating a pattern of burglaries in the neighborhood of 63rd and Ingleside in Chicago, Illinois, when they saw the defendant, on the afternoon of November 27, 1963, standing next to a garage in an alley in this neighborhood. They asked the defendant if he lived in the nieghborhood and if he had identification papers. The defendant gave them a social security card and an unemployment compensation card, saying he was Richard Scott. The social security card had Richard Scott's name on it, but the unemployment compensation card read Sylvester Lewis.

Again, the defendant said he was Richard Scott, whereupon the officers placed him in their squad car and proceeded to the police station to investigate these two names. The defendant was fingerprinted and also at the police station, Officer Mucharski remembered a stop order had been placed against a Sylvester Lewis.

In response to Officer Mucharski's call, Detective McCollum came to the police station an hour later, and Officer Mucharski testified that the detective confronted the defendant with a picture which police officers have with files and which Detective McCollum had taken out of his file. The defendant viewed this picture, said it was his, and admitted being Sylvester Lewis, which was also revealed by his fingerprints. He denied being involved in the burglary, however.

On cross-examination, Officer Mucharski testified that he arrested the defendant for questioning due to his conflicting identification papers coupled with the fact that the defendant was stopped in an area troubled with a pattern of burglaries.

The defendant did not testify. The only witness for the defense was Christine Lewis, the defendant's wife, who was an alibi witness. She testified that she had fallen down some steps at home on Saturday, August 24, 1963, and her husband had stayed with her on the night of August 25, 1963, a Sunday; that they watched television together and both retired at 1:30 or 2:00 a. m. on August 26, 1963; and that when she awoke at 7:00 a. m., her husband was still with her.

On cross-examination, she testified that the weekend before and the weekend after the burglary, her husband did not stay with her but was out until 1:00 or 2:00 a. m. Also, he was out this late on Friday and Saturday evenings immediately preceding the burglary, which occurred in the early morning hours of Monday, August 26, 1963. He did drive a Buick automobile.

On appeal, the defendant contends: (1) he was subject to an unconstitutional arrest and yet the "fruits" of that arrest were allowed to be admitted into evidence; (2) the one-man showup before Officer Daniels violated the defendant's constitutional rights as his lawyer was not present; (3) the trial court committed reversible error by allowing the prosecution to present evidence of the defendant's prior criminal record; (4) he was not proven guilty beyond a reasonable doubt; (5) he was denied equal protection when the trial court refused to provide him with a copy of the transcript from the prior trial, which had terminated in a mistrial. The State denies each of these contentions.

The defendant's first contention is that he was subjected to an unconstitutional arrest, and therefore the "fruits" of that arrest, his body, should not have been allowed into evidence. Thus, the eyewitness identification of Officer Daniels at the showup and at the trial must necessarily fall. The leading case cited by the defendant in support of this contention is Mapp v. Ohio, 367 US 643, 81 S Ct 1684 (1961). In that case the majority of the United States Supreme Court held that the right of privacy protected by the 4th Amendment of the United States Constitution prohibiting unreasonable searches and seizures was to be incorporated into the 14th Amendment's due process clause as a matter of fundamental right, and hence be binding upon State law enforcement officials as well as federal officers. The federal judicial standards in this area would henceforth be binding upon State law enforcement officers, as Wolf v. Colorado, 338 US 25, 69 S Ct 1359 (1949), was overruled insofar as it held to the contrary. Evidence illegally obtained by local officers, who were violating the 4th and 14th Amendments by their unreasonable searches and seizures, would no longer be admissible in State courts.

But the cited case and the present case are clearly distinguishable on their facts. In the Mapp case, the local police officers sought to invade the petitioner's home in the afternoon without a search warrant and based on an unnamed informer's tip. Upon being refused admittance, they waited for about three hours until more police came. The petitioner's attorney arrived at this time also. The police refused to show him a search warrant which they now allegedly possessed, but instead, put him to one side while they gained entry to the petitioner's home by breaking the glass on the rear door and opening the door from the inside. The evidence seized as a result of these methods was offered and received when petitioner was brought to trial for knowingly possessing certain lewd and lascivious books, pictures and photos in violation of a State statute. The alleged search warrant was never introduced into evidence nor was its absence explained.

In the present case, the police did not seek to invade a person's home without a search warrant, but rather arrested the defendant in an alley, in a neighborhood plagued with burglaries. Furthermore, the local officers placed the defendant under arrest only after he had failed to give them an adequate explanation for his contradictory identification cards. The cited case and the present case are distinguishable on their facts.

 More importantly, this entire point of an unconstitutional arrest was never brought to the trial court's attention through a pretrial motion to suppress the evidence, so seized, but rather the argument is raised for the first time on appeal. It now comes too late in the judicial process. The Illinois Supreme Court recently stated in People v. Harris, 33 Ill2d 389, 390, 211 NE2d 693, 694 (1965):

> ". . . On this appeal much of defendant's argument is devoted to the alleged illegality of his arrest. This issue becomes important only if the evidence obtained thereby is properly objected to at the trial.

470

It is well settled that this court will not consider the question of illegal search and seizure, even though pursuant to an illegal arrest, where it has not been raised before the trial court (cited cases omitted). Justice will not be served by permitting a defendant to proceed through an entire trial without raising alleged error and then take advantage of such error on an appeal from an adverse judgment."

Also see People v. Pecho, 362 Ill 568, 200 NE 860 (1936) ; People v. Bertrand, 385 Ill 289, 52 NE2d 706 (1944) ; and People v. Moore, 74 Ill App2d 24, 220 NE2d 105 (1966).

Secondly, the defendant urges that his one-man show-up before Officer Daniels was unconstitutional as his counsel was not present. In support of this contention, the defendant cites Wade v. U. S., 388 US 218, 87 S Ct 1926 (1967), which held that when a lineup is conducted after the accused has been indicted and has received court-appointed counsel, his constitutional right to receive the assistance of counsel requires that his attorney be present at all lineups as this is a critical stage of the adversary procedure. Both the 6th and the 14th Amendments require this. If this is not done, any courtroom testimony concerning lineup identification is inadmissible.

However, in one of the two companion cases decided with the Wade case, the United States Supreme Court held in Stovall v. Denno, 388 US 293, 87 S Ct 1967 (1967) that the Wade decision would not be applied retroactively but would only be applied prospectively from June 12, 1967. Since the questioned showup identification in this case occurred in December, 1963, and the trial here was concluded in June 1964, the constitutional principles enunciated in the Wade case are inapplicable here.

 Thirdly, the defendant urges that the trial court committed reversible error in allowing the State to produce evidence of the defendant's prior criminal record,

although the defendant did not testify. The testimony attacked on appeal by this argument is that of Officer Mucharski who stated on direct examination that Detective McCollum confronted the defendant with a picture which police officers have with their files and which the detective had taken out of his file. This was done because the accused denied being Sylvester Lewis. After seeing the picture, the defendant admitted he was Sylvester Lewis. The record indicates that the picture in question was never introduced into evidence. In People v. Ogden, 77 Ill App2d 312, 222 NE2d 329 (1966), this court approved the practice of using police photos to identify wrongdoers. Reference at the trial to such use was not improper as long as the pictures themselves were not introduced into evidence and the witness did not refer to the defendant's criminal record. Neither happened here and hence the proffered testimony is not objectionable.

██ Furthermore, no objection to this line of questioning was interposed by the defendant at his trial. Any objection to such testimony is therefore waived on appeal. See People v. Trefonas, 9 Ill2d 92, 136 NE2d 817 (1956), for the rationale supporting this rule.

Next, the defendant contends that the evidence was insufficient to sustain his conviction. In particular, he attacks Officer Daniels' identification testimony as being inadequate, since the policeman only saw the defendant for a few moments at a distance from thirty to forty-five feet. Furthermore, the officer's identification four months later of the defendant as the burglar was "tainted" as only a one-man showup was conducted. Such an argument overlooks the fact that these contentions were brought to the jury's attention at the trial, but they still chose to believe Officer Daniels. Officer Daniels also testified that he was able to get a full front view of the defendant's face for moments in the glare of the police spotlight, and before becoming a policeman, he had taken courses studying physical profiles and human faces for

472

his earlier work in mortuary science. The jury had this testimony for consideration.

 The one-man showup in the police station might be termed suggestive, but the manner and method of a defendant's identification is a matter which goes to the weight, rather than to admissibility or competency of identification evidence. People v. Tunstall, 17 Ill2d 160, 161 NE2d 300 (1959).

 The jury, by its verdict, chose to believe the eye-witness testimony of one identification witness. Such testimony is sufficient for the State to sustain its burden of proof in cases involving a weak alibi as a defense coupled with strong identification testimony which identification was initially obtained under good conditions. Such is this case.

 The identification testimony was corroborated by the testimony of the defendant's father, who reiterated to the jury the contents of his son's oral admission to him the day of the burglary in which the defendant admitted committing this crime with his friends. On appeal, the defendant argues that his father's testimony should be discredited because he was his accomplice. There is no evidence in the record to support this contention. The evidence was sufficient to sustain the conviction.

Finally, the defendant contends that he was denied equal protection of the laws because the trial court refused to give him a copy of the transcript from his prior trial which had ended in a mistrial. In support of this contention, the defendant cites People v. Miller, 35 Ill2d 615, 221 NE2d 653 (1966), in which the Illinois Supreme Court held that such a refusal was denial of a defendant's constitutional rights under the 14th Amendment's equal protection clause. However, the cited case and the present case are distinguishable on their facts.

 In People v. Miller, supra, the indigent defendant wanted a free transcript of his prior two trials, both ending in mistrials, so his counsel could use their contents

to perhaps impeach the prosecution's witnesses. To accomplish that objective, he filed a pretrial petition listing what he wanted and why it was important. In the present case, no pretrial petition was presented by the defendant, but rather he delayed until the first day of his second trial to make this request, although more than ninety days had elapsed between the date of the mistrial and the start of this trial. When asked by the court the reason for this delay, the defendant replied that the day before this trial started, he had received a new attorney from the Public Defender's Office. Only then did a transcript of his prior trial become essential to him.

His new attorney then said a transcript was unnecessary in the trial of this case. The trial court stated that he could not delay the trial any longer, but if the need for such a transcript became evident so that the defendant's rights would be prejudiced by virtue of his not having it, the trial court would take appropriate action. In the trial that followed, defense counsel never indicated that a transcript of the prior proceedings was essential to the defendant's rights nor did he ever request such a transcript. Hence, the argument is not well taken on appeal.

For the foregoing reasons, the judgment is affirmed.

Judgment affirmed.

BURKE, P. J. and McNAMARA, J., concur.