THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DANNY RAY GABBARD, Defendant-Appellant.

Fourth District   No. 14857

Opinion filed January 26, 1979.

MILLS, J., dissenting.

Richard J. Wilson and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (Robert C. Perry and Gary J. Anderson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

After trial by jury in the circuit court of Sangamon County, defendant Danny Ray Gabbard was convicted of burglary and armed

robbery and sentenced to a term of 20 to 40 years' imprisonment on the armed robbery conviction. Upon appeal, he asserts that the trial court erred in denying his pretrial motions to quash his arrest and to suppress evidence seized, statements made by him in custody, and certain identifications made of him. We agree that some of the relief he requested in those motions should have been granted and, accordingly, reverse and remand for a new trial.

The evidence at trial of the occurrence of the armed robbery was not in dispute and need not be related in detail. On the evening of March 4, 1977, two masked men and one unmasked man entered the Springfield home of Leroy and Mary Cummings and at gunpoint, held them along with Mrs. Cummings' son John Prillaman at bay while taking items of substantial value from them. At trial, all three victims identified defendant as the unmasked bandit. Leroy Cummings and Prillaman had also identified defendant in a pretrial lineup.

Defendant's various motions to suppress were premised upon his contention that he had been impermissibly stopped and searched by police and that the items taken from him, in custody statements given by him, and identification made of him were all fruits of that improper police conduct.

At the hearing on the motion to suppress, Illinois State Policeman Earl Acup testified that on April 29, 1977, he was driving south on U.S. 66 near the northwest corner of Lincoln, Illinois, when he saw the defendant walking south on the right shoulder of the road. Acup stopped behind the defendant, who turned, came back to the squad car, opened the door and got in. The trooper had not put his lights or siren on, or told the defendant to come to the car, nor did he motion the defendant back to the car. Acup inquired as to where Gabbard was going and the defendant replied he was going to Springfield and that he had come from Springfield. After asking the defendant's name, the officer asked for identification, whereupon Gabbard opened a checkbook that had his name printed on the checks. Officer Acup testified that he could see an Illinois driver's license sticking out from a corner of the checkbook. He asked whether or not the defendant had any other identification, to which Gabbard replied, "No," and put the checkbook back in his bag. The officer immediately told defendant to put his head forward and his hands behind him, and Acup drew his weapon and placed handcuffs on the defendant. Officer Acup took the checkbook back out of defendant's bag and found both an Illinois and a Missouri driver's license. Defendant was then taken to jail.

Trooper Acup testified that defendant was not violating any law when he pulled up behind him, but that it was the policy of the Illinois State Police to check out *everybody* found walking along a public highway to find out what they are doing. (Defendant testified that Officer

Acup pulled up behind him and motioned for him to come back to the car, telling him to get in. He also said that the officer had his weapon cocked and halfway out of its holster.)

The parties stipulated at the hearing that John Prillaman's Missouri driver's license, social security card, college identification cards, a car rental card, and other items testified to by Prillaman as having been taken from him at the robbery and admitted into evidence at trial, were taken by police from defendant's checkbook or his bag. They also stipulated that a gun admitted into evidence had been taken from the bag.

The parties agree that defendant was arrested by the time the officer drew his gun and placed handcuffs on the defendant. Defendant argues on appeal that the officer had violated defendant's rights by merely questioning him and asking him for identification and that this conduct invalidated the subsequent search and seizure. We need not decide this question because we conclude that the arrest itself was without probable cause and thus invalidated the subsequent search and seizure.

To support the arrest the State relies heavily on testimony that six days prior to the arrest, Officer Acup had seen a bulletin which indicated that an escaped Federal prisoner might be on Interstate 55 or Peoria Road north of Springfield. Peoria Road converges into Interstate 55 north of Springfield and a person going northerly on Interstate 55 would pass by Lincoln. The escapee was described as a white male, 5′9″ in height and weighing 150 pounds, with scars on his left ring finger and left arm, possessing blue eyes and brown hair, wearing blue jeans and a green army fatigue jacket, and carrying a backpack. The officer explained that police are constantly furnished with information of this nature about persons wanted for crime. When asked if he had the report of the escaped person on his mind when he stopped his car by the defendant, the officer testified, "You always have something like that on your mind." Testimony indicated that the defendant was a white male about 6′ or 6′1″ in height, and carried a gas mask bag but was not wearing an army jacket. No showing was made as to whether he had scars.

The State maintains that this evidence coupled with the officer's testimony that the defendant stated that he was both going to and coming from Springfield and the officer's testimony that the defendant had a driver's license in his checkbook but did not show it for identification was a sufficient basis for the trial court's finding of probable cause. The State cites the case of *People v. Lewis* (1968), 92 Ill. App. 2d 463, 236 N.E.2d 417. There, the accused was stopped by police officers who were investigating a pattern of burglaries in a crime-ridden neighborhood. Upon request for identification, the accused gave the officers an unemployment compensation card having one name on it and a social security card with a different name upon it. The accused told the officers

that his name was that shown on the social security card. The officers then arrested the accused. The propriety of the arrest was raised for the first time on appeal and ruled to be waived. The opinion indicated that the case differed from the cases cited by the accused but did not state that the arrest would have been upheld if the point had not been waived.

■■ In order to arrest a person without a warrant and without knowledge that a warrant has been issued for that person, a police officer must have "reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) The defendant was 3 or 4 inches taller than the escapee and wearing somewhat different clothing. He was some 30 miles from where the escapee had been believed to be 6 days earlier. Although the officer saw defendant's hands before the arrest, no showing was made that the officer looked for a scar on the left ring finger. Even though the defendant gave a suspicious answer when he stated that he was both coming from and going to Springfield and although the officer might have inferred that the defendant had a driver's license in his possession that did not belong to him or did not want the officer to know his true name, we find this evidence insufficient as a matter of law for the officer to have had reasonable grounds to believe that the defendant was the escapee. We also find it insufficient as a matter of law to be the basis of reasonable grounds for the officer to have believed that defendant was committing or had committed any other crime.

Although both in the trial court and on appeal, defendant has placed the thrust of his argument on the theory that the officer's original questioning of him was improper, the issue of probable cause for the arrest has been raised in both courts. We recognize that arresting officers must make difficult, quick decisions based on probabilities (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356), but arrests cannot be made upon mere suspicions. (*People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.) We rule the finding of the trial court that probable cause existed for the arrest to be contrary to the manifest weight of the evidence. The motion to quash the arrest and suppress the evidence seized should have been allowed. For this reason we reverse and remand for a new trial.

In order that any subsequent trial be properly conducted, we must pass upon the trial court's denial of the motion to suppress statements and identification.

The evidence at the suppression hearing showed that defendant was taken first to the Logan County jail and then, in the afternoon of his arrest, transferred to the Sangamon County jail. A State police investigator testified that he first talked to defendant at the Logan County jail at 9 a.m. and advised him of his *Miranda* rights and then asked him some questions

about the Cummings' robbery which defendant did not answer. Detective Sedlak of Sangamon County testified that he and Detective Dalby interviewed defendant about 2:45 p.m. that day at the Sangamon County jail and also advised defendant of his *Miranda* rights. Defendant indicated a willingness to talk without a lawyer. They showed defendant a composite drawing of a suspect in the Cummings' robbery and the defendant admitted that he had many characteristics similar to those of the suspect in the drawing.

Testimony was further presented that after being told that a lineup would be conducted, defendant told the officers "I can clear this matter up, but some consideration must be given to my testimony." Defendant then stated that he wanted lenient treatment for various charges pending against him. Defendant was taken to a lineup and then told that he had been picked out during the lineup. Defendant then made several of the statements admitted at trial. The next day further questioning of defendant took place after *Miranda* rights were further explained to him and he made further statements which were also later admitted at trial.

Not all State's evidence which would not have been obtained but for an illegal arrest of a defendant is required to be suppressed. In *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 441, 83 S. Ct. 407, a defendant was arrested without probable cause, released on his own recognizance, and, several days later, returned on his own volition to the police station and confessed. The confession was ruled to be admissible.

On the other hand, in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, inculpatory statements made by an illegally arrested defendant to officers at a police station, with the first statement being made less than two hours after the arrest, were ruled inadmissible as violative of the fourth amendment. The Illinois Supreme Court had approved the admission into evidence of the statements on the basis that the giving of *Miranda* warnings to the defendant had broken the chain between the unlawful arrest and the giving of the statements and rendered them voluntary. (*People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356.) The United States Supreme Court opinion in *Brown* explained that the fifth amendment rights of the defendant protected by the *Miranda* warnings were only one aspect of the constitutional permissibility of admitting the defendant's statements into evidence. The effect on fourth amendment rights of admitting the statements also required consideration. The opinion concluded that whether the statements must be suppressed depended. in addition to their voluntariness, upon (1) the time span between arrest and the statement, (2) intervening circumstances, and (3) "the purpose and flagrancy of the official misconduct" (422 U.S. 590, 604, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2262). The court noted that the purpose of Brown's arrest appeared

to be to coerce him to confess. He was converged upon by police officers in his home at night. The burden of showing admissibility was stated to be on the prosecution.

■■ Subsequent to *Brown* this court decided *People v. Henderson* (1975), 32 Ill. App. 3d 1001, 337 N.E.2d 85. There, an accused, after being taken to the police station and fingerprinted, was confronted by an officer who, after giving *Miranda* warnings, urged the defendant to confess because his fingerprints matched those taken from the scene of the burglary with which he was charged. This occurred at 9 p.m. Early the next morning, about 9 hours after the arrest, the accused confessed. We affirmed the subsequent convictions, holding that even though the propriety of the accused's arrest was uncertain, the giving of the *Miranda* warnings, the 9-hour time span between arrest and confession, the lack of flagrancy in any improper arrest, and, most importantly, the intervening factor that the confession had been made after the fingerprints were matched, combined to make the evidence admissible even though the original arrest may have been without probable cause.

In the case before us on appeal, evidence was presented that (1) *Miranda* warnings were given, (2) at least 8 hours transpired after the arrest before defendant even mentioned making any admissions, (3) defendant initiated his admission by offering to plea bargain, and (4) the unlawful arrest was not flagrant. Although defendant's testimony on the motions to suppress the statements was somewhat at variance with the recited evidence, the court was not required to accept it. Even though the arrest was improper, the motion to suppress the statements was properly denied.

■■ The State does not dispute that if the arrest was invalid the lineup evidence should be suppressed. Suppression of the lineup evidence, however, would not prevent in-court identification of the defendant by the witnesses if the prosecution can show that the identification has a proper independent base. (*People v. Hornal* (1975), 29 Ill. App. 3d 308, 330 N.E.2d 225.) The trial court did not pass upon this question in the prior trial.

As we have previously stated, the convictions and sentence of defendant are reversed and the case is remanded to the circuit court of Sangamon County for a new trial conducted consistently with the views expressed herein.

Reversed and remanded.

CRAVEN, J., concurs.

Mr. JUSTICE MILLS, dissenting:

A *valid* arrest.

I quarrel not with the law cited by the majority, but we most assuredly part ways when it comes to applying that law to the factual backdrop of this case.

Here, Gabbard was walking alone on a U.S. highway, and the policy of the Illinois State Police is to investigate everyone who is found walking along a public thoroughfare of this nature. At the time of the apprehension, there existed a dispatch circulated out of both the Springfield and Pontiac State Police District Headquarters for a Federal prisoner-escapee, who was believed to be on Peoria Road just north of Springfield, or on I-55 north of Springfield. Now—with these elements in mind—Trooper Acup investigates Gabbard, who says he's going to Springfield but that he had just come from Springfield and says that the only identification he had was a checkbook. When the checkbook is opened and shown to the trooper, Acup sees an Illinois driver's license in the corner of the checkbook. Acup then asks if Gabbard has any further identification. The defendant says, "No," folds the checkbook up and puts it back into the bag that he is carrying. He is then placed under arrest.

I find probable cause. The majority has become bogged down in a morass of details—height, weight, scars, eyes, hair, pants, jacket, what he was carrying, etc. The fact still remains that there was a common similarity between the description broadcasted in the dispatch and the general appearance of the defendant. And I cannot justify throwing out an arrest simply because the officer may not have looked for a scar on the left ring finger of the subject.

There are innumerable instances where insufficient time and opportunity is afforded police officers to stop and take an inventory, or consult a checklist, or study and compare, or to ascertain if there is exactness in all of the minutiae of a description. And to require such action by law enforcement officers would do severe violence to common sense. In *People v. Robinson* (1976), 62 Ill. 2d 273, 276-77, 342 N.E.2d 356, 358, the Illinois Supreme Court said:

> "In considering whether probable cause existed, we stated in *People v. Clay*, 55 Ill. 2d 501, 504-05, 'Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act.

*Draper v. United States*, 385 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Fiorito*, 19 Ill. 2d 246.' Also it is proper to recognize in judging whether there was probable cause that '[p]olice officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' *People v. Watkins*, 19 Ill. 2d 11, 19."

And as the trial judge observed in this case—when he found probable cause and denied the motion to quash and suppress—we must recognize that when the police officers "* * * are in the field they do not have time to review all the cases on reasonable search and seizure. They have to work from the so-called pits."

In short, considering the totality of the circumstances here, I believe: that there was probable cause that Gabbard had committed a crime; that the motion to quash and suppress was properly denied; that Gabbard was convicted after a fair trial; that he was properly sentenced to 20-40 years' imprisonment; that he should be serving that sentence right now; and that this appeal should be affirmed.

I dissent.