(No. 51805

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. DANNY GABBARD, Appellee.

*Opinion filed December 3, 1979.*

UNDERWOOD, CLARK and RYAN, JJ., concurring in part and dissenting in part.

William J. Scott, Attorney General, and C. Joseph Cavanagh, State's Attorney, both of Springfield (Donald B. Mackay and Melbourne Noel, Assistant Attorneys General, of Chicago, and Marc D. Towler and Gary J. Anderson, of the State's Attorneys Appellate Service Commission, of counsel), for the People.

Richard J. Wilson, Deputy Defender, and Karen Munoz, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

After a trial by jury in the circuit court of Sangamon County, the defendant, Danny Ray Gabbard, was convicted of burglary and armed robbery, and was sentenced to serve from 20 to 40 years' imprisonment. The appellate court, one judge dissenting, reversed and remanded for a new trial (67 Ill. App. 3d 945), and we granted the State's petition for leave to appeal.

The issues before us grow out of the denial by the trial court of the defendant's pretrial motion to suppress articles seized from him at the time of his arrest and of inculpatory statements made thereafter while in police custody on the ground that his arrest was unlawful. The articles of evidence and the statements were admitted into evidence at his trial. The trial court ruled that the arrest had been valid. The appellate court reached the opposite conclusion. It went on to hold that the articles seized from the defendant should have been suppressed, but that the illegality of the arrest did not render the inculpatory statements inadmissible.

The burglary and armed robbery of which the defendant was convicted took place at the home of Mr. and Mrs. Leroy Cummings in Springfield, on the evening of March 4, 1977. The defendant gained entrance by a subterfuge, and then admitted two confederates. Mr. and Mrs. Cummings, and the latter's son, John Prillaman, who was staying with them, were held at gunpoint and were robbed of various articles. During the robbery each of the defendant's accomplices wore a mask. The defendant, however, did not, and at his trial each of the three victims identified him as one of the robbers. The defendant did not testify and presented no evidence at his trial. The record does not show what disposition was made of the two accomplices.

The testimony given at the pretrial hearing was that the defendant was arrested at about 7 a.m. on April 29,

1977, on a highway near Lincoln, which is some 30 miles north of Springfield. The arrest was made by Earl Acup, a State Police officer. Acup testified that when driving his police car south on U.S. 66 in the outskirts of Lincoln, he observed the defendant walking south on the shoulder of the southbound lane. Acup pulled his car onto the shoulder and drew up behind the defendant. The latter turned and saw the police car, walked back to it, opened the door on the passenger side, and got in. Acup testified that he had not called to the defendant or motioned him to approach the car, although the defendant testified that Acup had beckoned to him.

Acup inquired where the defendant was going, to which the reply was "Springfield." Acup then asked where the defendant was coming from, and the same answer was given. After asking the defendant his name, which the defendant supplied, Acup asked if the defendant had any identification. The defendant stated that the only identification he had was a checkbook, which he produced from a bag he was carrying and displayed to Acup. The checkbook contained blank checks on which the defendant's name was imprinted. Acup noticed a piece of paper stuck in the checkbook which appeared to be an Illinois driver's license, and he asked if the defendant had any further identification. The defendant said no, and started to replace the checkbook in his bag. At that point, Acup testified, "I ordered him to put his head forward on the dash, his hands behind him. I drew a weapon and handcuffed him."

Acup took possession of the checkbook and searched it. He extracted the Illinois driver's license which he had previously noticed and also a Missouri driver's license. Neither of these bore the defendant's name. It was stipulated that the Illinois license bore the name of one Roosevelt Irvin, whose identity is not disclosed by the record. The Missouri license belonged to John Prillaman, one of the victims of the robbery. It was brought out at

the trial that the license had been in a wallet which was taken from Prillaman in the robbery. There is no suggestion that Acup was aware of the Springfield robbery at this time.

Acup drove the defendant to the Logan County jail in Lincoln. While on the way Acup inquired over his radio for information about the defendant and the two persons whose names appeared on the licenses, and received a radio report that the defendant was wanted for parole violation and for escape from a State mental institution. After Acup and the defendant arrived at the county jail, a search was made of the defendant's bag, in which a loaded pistol was found. The defendant was then booked on a charge of carrying a concealed weapon.

When asked why he pulled his car over and stopped by the defendant, Acup testified on direct examination in the hearing on the motion to suppress that his reason was a police department policy "to check out everybody you find walking on the road no matter what the reason may be, whether there is a stranded motorist or somebody that's wanted for something or somebody that just happens to be there. You pull over and find out what they're doing." In response to the question whether there was any other reason, Acup answered no.

On cross-examination by the State Acup nevertheless offered as an additional reason that six days earlier, among the reports distributed of persons wanted by the police, he had seen one of an escaped Federal prisoner who was then believed to be on a road some 30 miles away from the point where Acup encountered the defendant. The report, a copy of which was introduced in evidence, did not contain a detailed description of the escapee. It did give his height and weight and the clothing he was wearing, each of which differed from those of the defendant, as Acup admitted. Acup was not asked whether he believed from the defendant's appearance that the latter was the escapee.

The defendant contends that Acup's questioning of

him was itself a restraint which, under the doctrine of *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, and its progeny, must meet a test of reasonableness, and that it failed to do so. We find it unnecessary to consider that contention, for the articles in question were not seized from the defendant until after he had been handcuffed. Although Acup did not then tell the defendant that he was under arrest, the State admits that his handcuffing constituted an arrest, and we agree. See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

Section 107—2(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c)) authorizes an officer to arrest a person without a warrant when the officer "has reasonable grounds to believe that the person is committing or has committed an offense." The State does not maintain that any of the criteria contained in the departmental policy testified to by Acup would justify the arrest, but asserts that Acup had reasonable grounds to believe that the defendant was the escapee referred to in the police report. For several reasons that argument must be rejected.

The description contained in the police report was so general and lacking in distinctiveness as to furnish no more basis for the arrest of the defendant than of many other persons who might be walking along the highway. (*In re Woods* (1974), 20 Ill. App. 3d 641, 646-48; *United States ex rel. Wright v. Cuyler* (3d Cir. 1977), 563 F.2d 627, 630.) Acup himself admitted, moreover, that the defendant did not match the description as to those few particulars which the description provided. Acup did not testify that his stop of the defendant was motivated by a belief that the latter was the escapee, and his permitting the defendant to enter and sit down in the police car is not consistent with such a belief.

The State argues that when the defendant, after being asked for identification, failed to produce the Illinois

driver's license which Acup saw in his checkbook, Acup could reasonably infer that the license belonged to the defendant, and that inspection of it would reveal that "Gabbard" was not his real name. When encountered by Acup, however, the defendant was not operating a motor vehicle.

Whether at this point Acup could have detained the defendant temporarily and required him to answer further questions about his identity is not relevant. (See *Brown v. Texas* (1979), 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637.) What took place here was an arrest, and the question is whether there were reasonable grounds to believe that the defendant was the person who had committed the offense, *i.e.,* that he was the escapee. We agree with the appellate court that there were not, and that the documents seized from the defendant at that time should have been suppressed.

We therefore affirm the judgment of the appellate court reversing the judgment below and remanding the cause for a new trial. Since the case must be retried, we proceed, as did the appellate court, to consider whether the statements which the defendant made to police about the robbery should also have been suppressed under the decision of the Supreme Court in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

Prior to *Brown v. Illinois* the applicability of the fourth amendment to incriminating statements made by a defendant after an unlawful arrest had already been established by the Supreme Court in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407. That case was decided before *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, however. *Brown* was thus significant in its holding that statements which might otherwise have been barred because of an unlawful arrest were not rendered admissible simply because the defendant had been given the warnings which *Miranda* held were required under the fifth amend-

ment. It was on this basis that the Supreme Court reversed *People v. Brown* (1974), 56 Ill. 2d 312, in which this court had reached a contrary conclusion. See 56 Ill. 2d 312, 317.

In *Brown* police officers investigating a recent murder broke into the defendant's apartment without a warrant, searched it, and, when the defendant returned, arrested him at gunpoint. He was taken to a police station, where, less than two hours after his arrest, he gave the first of two confessions. The purpose of the police action was concededly to question the defendant about the murder, and the grounds for his arrest consisted of no more than that he was an acquaintance of the victim and had been seen in the victim's apartment building on the day of the murder. This court had held that those grounds fell short of probable cause. (56 Ill. 2d 312, 315.) *Brown* was followed by *Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258, which, like *Brown*, was a case where the defendant had been unlawfully taken into custody for the purpose of investigating the identical crime to which his incriminating statements related.

It is important to note that the Supreme Court has rejected a simple "but for" test under which any statement by a defendant following his unlawful arrest must be suppressed on the ground that the statement would not have been made had he not been taken into custody. The evidence in the cases considered by the court showed a causal connection between the illegal arrest and the statement such that the statement could be said to have been obtained by exploitation of the illegality. (*Wong Sun v. United States* (1963), 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417; *Brown v. Illinois* (1975), 422 U.S. 590, 598-99, 604, 45 L. Ed. 2d 416, 424, 427, 95 S. Ct. 2254, 2259, 2262; *Dunaway v. New York* (1979), 442 U.S. 200, 217-18, 60 L. Ed. 2d 824, 839-40, 99 S. Ct. 2248, 2259.) The opinions mention as significant factors in ascertaining whether such causality exists the "temporal proximity" of the arrest and the confession, the presence

or absence of intervening circumstances, and the purpose of the official misconduct. *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.

The circumstances of the arrest and the incriminating statement here are markedly different from those in the cases described above.

As already noted, after being taken to the Logan County jail, the defendant, who by then was known to be wanted on charges of parole violation and escape from a State institution, was searched, and when a loaded pistol was found in his bag, he was booked on a charge of carrying a concealed weapon.

At about 9 a.m. a conversation took place between the defendant and Robert Carnduff, a detective with the State Police, regarding the Cummings robbery, word of which had reached Carnduff as the result of Acup's radio report that the defendant was carrying a driver's license issued to Prillaman. Carnduff testified at the pretrial hearing that he first informed the defendant of his *Miranda* rights, and that the defendant waived them. Thereafter Carnduff asked the defendant a few questions, the specific nature of which does not appear in the report of proceedings, to which the defendant made no response.

Carnduff then drove the defendant to the office of the sheriff of Sangamon County in Springfield, arriving there about 2:30 or 3 p.m. Shortly after arrival the defendant was interrogated by Dennis Sedlak, a deputy sheriff, who also testified at the pretrial hearing. Sedlak told the defendant that he and a partner were investigating a robbery of the Cummings home which had taken place in Springfield on March 4, and then read the defendant his *Miranda* rights. The defendant again stated that he was willing to talk without having an attorney present.

At the time when this interview took place, Sedlak testified, he was aware that the defendant was being held in custody as an escapee from Menard Mental Institute. He

was also aware that items reportedly taken in the Cummings robbery had been found in the defendant's possession. It does not appear from Sedlak's testimony or that of any other witness, however, that Sedlak was acquainted with the circumstances leading to the defendant's arrest.

Sedlak showed the defendant a composite sketch which had been prepared by the sheriff's police a few days after the robbery from descriptions, supplied to the police by each of the victims, of the unmasked robber who had entered the Cummings home. Sedlak inquired whether the defendant thought the sketch resembled him, and the reply was that the sketch showed many similar characteristics.

Sedlak told the defendant that there was to be a lineup at which the defendant would be viewed by victims of the robbery. The defendant then said, "I can clear this matter up, but some consideration must be given to my testimony." When asked what he meant, the defendant explained that there was another armed robbery charge pending against him in Kankakee, and that he had additional time to serve on a term of imprisonment to which he had been sentenced in Kentucky and from which he had been released on parole. The defendant said that he was willing to cooperate in the robbery prosecution, provided that any sentence which he might receive would be made concurrent with a sentence under the Kankakee charge and with the balance of his term of imprisonment in Kentucky.

It is a fair inference that at this stage in the investigation of the Cummings robbery the police would have been interested in securing information from the defendant which would aid in the prosecution of the accomplices as well as testimony for the State at their trial. Sedlak told the defendant that he had no power to enter into such an agreement. He did undertake to transmit the defendant's proposal to the Kankakee authorities to

ascertain their reaction, and he subsequently did so, but no claim is made by the defendant that the statements given by him to the police were induced by any promise of leniency or special consideration.

At the lineup the defendant was viewed by two of the victims, and each identified him. The third victim was unable to be present because of an out-of-town trip. At about 6:30, following the lineup, a further conversation between Sedlak and the defendant took place in which Sedlak informed the defendant that the latter had been identified by the victims, and the defendant responded that he had expected that to happen, given the circumstances of the robbery. He was then asked to supply information about the details of the robbery, and gave a very circumstantial account which, according to Sedlak's testimony, corresponded closely with the reports previously given to the police by the victims.

The unlawful arrest of the defendant was thus not made in the course of an investigation into the robbery or for the purpose of interrogating the defendant on that subject. Neither the arresting officer nor the governmental entity by which he was employed was investigating that crime or was responsible for doing so, and the arresting officer was not even aware that it had occurred. The interrogating officer, on the other hand, knew that the defendant was in custody as the result of having escaped from an institution, and while also aware that the defendant had been found in possession of articles stolen in the robbery, he did not know the circumstances leading to the defendant's arrest. We are not presented here with an attempt by police to avoid responsibility by dividing it among different individuals. (*Cf. People v. White* (1975), 61 Ill. 2d 288, 294; *People v. Blanchard* (1967), 37 Ill. 2d 69, 73.) In the present case the purpose of the exclusionary rule, *i.e.*, to deter improper police conduct (*Dunaway v. New York* (1979), 442 U.S. 200, 217-18, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259) would be served

minimally, if at all, by exclusion of the defendant's statements.

The evidence also shows that the defendant's statements were prompted by intervening events. Early in the interrogation the defendant was shown the sketch which had been prepared prior to his arrest, and he acknowledged that it resembled him. Prior to the lineup he also impliedly admitted his involvement in the robbery by volunteering to cooperate in the prosecution if a favorable arrangement for serving his sentence could be reached. In addition, when the defendant, immediately preceding his inculpatory account of the robbery, was told that he had been identified by each of the viewers at the lineup, he responded to that information by stating that he was not surprised.

Whether the identification of the defendant in the lineup may be included as an intervening event presents some difficulty. The defendant's pretrial motion sought suppression of the lineup identification on the ground that the lineup itself was a consequence of his unlawful arrest, and the appellate court states in its opinion that the State has conceded that the lineup evidence should be suppressed. (67 Ill. App. 3d 945, 950.) The question whether lineup testimony is to be treated by the same standards applicable to confessions is not clear (see, *e.g., Davis v. Mississippi* (1969), 394 U.S. 721, 727, 22 L. Ed. 2d 676, 681, 89 S. Ct. 1394, 1397-98; *Wise v. Murphy* (D.C. App. 1971), 275 A.2d 205), and neither party discusses this issue in its brief. Rather than decide that question, we believe it is appropriate under the circumstances to hold only that the State has waived any objection to suppressing the lineup evidence. As the appellate court points out, such a conclusion, of course, does not preclude the use of in-court testimony having a proper independent basis.

The defendant has not called our attention to any cases involving facts similar to those presented here, but

we find two decisions of the Supreme Court of Pennsylvania which are pertinent. In *Commonwealth v. Wright* (1975), 460 Pa. 247, 332 A.2d 809, the defendant was arrested immediately after a street-corner robbery and murder on the basis of a radio description. Upon first being interrogated the defendant denied any participation in the crime. Subsequently an accomplice was arrested for the same crime and made a statement to police implicating both himself and the defendant, which he later repeated in the presence of the defendant and police officers. At that point the defendant confessed. An issue in the case was whether the defendant's arrest had been illegal. The supreme court, assuming *arguendo* that it was, went on to hold, citing *Wong Sun v. United States,* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, that the confession was nonetheless admissible, since it was not causally related to the invasion of the defendant's rights. See also *United States ex rel. Wright v. Cuyler* (3d Cir. 1977), 563 F.2d 627.

The *Wright* decision was followed in *Commonwealth v. Bogan* (1978), 482 Pa. 151, 393 A.2d 424. The Supreme Court of Pennsylvania, although reversing the defendant's conviction of murder on other grounds, held admissible a confession made to police while he was in custody after what the court, for purposes of decision, assumed to be an illegal arrest. The court noted that upon being interrogated the defendant had at first denied any knowledge of the murder, and only confessed after he had been advised that he matched a description of the assailant already given the police by an eyewitness.

For the reasons given, the judgment of the appellate court is accordingly affirmed.

*Judgment affirmed.*

MR. JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I disagree with the majority opinion insofar as it holds

that the documents seized from the defendant after his arrest should have been suppressed. In my judgment, sufficient evidence was presented during the hearing on defendant's motion to suppress to support the trial court's finding that there was probable cause for the arrest. (See Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c), as defined in *People v. Wright* (1974), 56 Ill. 2d 523, 528.) A trial court's determination as to probable cause should not be disturbed unless manifestly erroneous, which it seems to me it is not. *People v. Clay* (1973), 55 Ill. 2d 501, 505, citing *People v. Dailey* (1972), 51 Ill. 2d 239; *People v. Brooks* (1972), 51 Ill. 2d 156.

It is elementary, of course, that an arrest is supported by probable cause when the facts and circumstances within the officer's knowledge would lead a man of reasonable caution to believe that an offense has been committed and that the person apprehended has commited the offense. (*Gerstein v. Pugh* (1975), 420 U.S. 103, 111, 43 L. Ed. 2d 54, 64, 95 S. Ct. 854, 862; *Adams v. Williams* (1972), 407 U.S. 143, 148, 32 L. Ed. 2d 612, 618, 92 S. Ct. 1921, 1924; *Beck v. Ohio* (1964), 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225; *People v. Robinson* (1976), 62 Ill. 2d 273, 276.) In determining whether probable cause existed, this court has emphasized that the totality of facts and circumstances known to the officer when the arrest was made must be considered. (*People v. Robinson* (1976), 62 Ill. 2d 273, 276; *People v. Clay* (1973), 55 Ill. 2d 501, 504.) Moreover, in deciding questions of probable cause courts deal with probabilities which are not technical but which are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Adams v. Williams* (1972), 407 U.S. 143, 149, 32 L. Ed. 2d 612, 618, 92 S. Ct. 1921, 1925; *Draper v. United States* (1959), 358 U.S. 307, 313, 3 L. Ed. 2d 327, 332, 79 S. Ct. 329, 333; *Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1891, 69 S. Ct. 1302, 1310; *People v. Robinson* (1976), 62 Ill.

2d 273, 277; *People v. Clay* (1973), 55 Ill. 2d 501, 505.

The testimony at the hearing indicated that six days prior to the incident the arresting officer had received a report describing a Federal prisoner who had escaped and was believed to be approximately 30 miles from the location of the arrest. Although the description of the escapee varied somewhat from the defendant's appearance, the police officer testified that the report was on his mind when he drove his car onto the highway shoulder where the defendant had been walking. Moreover, one of the reasons the State troopers stopped persons walking along main highways was to ascertain whether the persons were in need of assistance. For these reasons, the officer stopped the defendant and inquired regarding his destination. When the defendant gave the anomalous answer that he was both going to and coming from Springfield, the officer asked for identification, and the defendant produced only personalized checks. Having seen a driver's license tucked among the personal checks, the officer asked whether the defendant had any additional identification. When defendant denied that he did and started to place the checks and license in the bag he was carrying, he was arrested.

The officer had testified that the defendant voluntarily approached the squad car after it stopped. While defendant testified the officer beckoned him to the car, the trial court apparently accepted the officer's statements and found that the defendant acquiesced in the temporary questioning that transpired prior to his arrest. Accordingly, any characterization of that incident as a stop or seizure in the absence of any attempt to detain or restrain the defendant against his will is unsupportable. (See, *e.g.*, *People v. Tilden* (1979), 70 Ill. App. 3d 859, 862; *People v. Kennedy* (1978), 66 Ill. App. 3d 267, 273; *People v. Jordan* (1976), 43 Ill. App. 3d 660, 662-63; *People v. Oritz* (1973), 18 Ill. App. 3d 431, 433; *People v. Hines* (1973), 12 Ill. App. 3d 582, 588.) Even if regarded as a

"stop," however, the facts supporting it are "based on more substantial facts and circumstances than \*\*\* a mere hunch." (*People v. McGowan* (1977), 69 Ill. 2d 73, 77-78, citing *Terry v. Ohio* (1968), 392 U.S. 1, 27, 20 L. Ed. 2d 889, 909, 88 S. Ct. 1868, 1883.) Once the defendant had denied the possession of any identification other than the checks, it seems to me the officer, who had seen a driver's license, acted quite reasonably in arresting defendant in the belief that an offense had been committed by him.

In my opinion the trial court properly denied the motion to suppress the evidence seized subsequent to the arrest.

MR. JUSTICE RYAN joins in this partial concurrence and partial dissent.

MR. JUSTICE CLARK, also concurring in part and dissenting in part:

The facts are not in dispute. The appropriate law is not in dispute. Application of the law to the facts is in dispute. I believe the majority opinions here and in the appellate court (67 Ill. App. 3d 945) have usurped the trial court's responsibility. It is the function of that court to determine whether probable cause, or reasonable grounds (Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c); *People v. Wright* (1974), 56 Ill. 2d 523, 528-29), existed for the arrest; and that court's finding should not be disturbed unless manifestly erroneous (*People v. Clay* (1973), 55 Ill. 2d 501, 505).

I agree with the majority here that the case does not involve a *Terry* stop (*Terry v. Ohio* (1968), 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16), since, prior to the arrest (at the point of handcuffing), there was apparently no display of physical force by which Trooper Acup restrained the liberty of the defendant.

The dissent in the appellate court (67 Ill. App. 3d 945, 951-52) cited the appropriate law: *People v. Robinson* (1976), 62 Ill. 2d 273, 276-77. There this court stated:

> "In considering whether probable cause existed, we stated in *People v. Clay*, 55 Ill. 2d 501, 504-05, 'Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Draper v. United States*, 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Fiorito*, 19 Ill. 2d 246.' Also it is proper to recognize in judging whether there was probable cause that '[p]olice officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' *People v. Watkins*, 19 Ill. 2d 11, 19."

Applying this to the factual situation here, the trial court was not manifestly in error, even though I might have viewed the totality of circumstances differently.

The Illinois State Police, for example, in order to help motorists in distress or to facilitate public safety, has the policy of investigating pedestrians on a public highway. The defendant, a white male about 6 feet tall and carrying a gas-mask bag, was walking south on U.S. 66, towards Springfield, when he was spotted by Acup. At the time, there was a police bulletin, circulating in Acup's area, which described an escaped Federal prisoner: white male, 5 feet 9 inches tall, 150 pounds, wearing jeans and army fatigue jacket, and carrying a backpack. That description is

not so vague as the majority states. The defendant, walking along the highway and seen from a passing car, would not unreasonably fit that description: 5 feet 9 inches tall and a backpack, in the abstract, is not far removed from 6 feet and a gas-mask bag, in the concrete. According to Acup's testimony, the defendant answered he was coming from and going to Springfield; the defendant identified himself with a checkbook; the defendant said he had no further identification although Acup noticed an Illinois driver's license. The defendant was then arrested. I agree with the appellate court dissent (67 Ill. App. 3d 945, 951) that similarity between the dispatch's description and the defendant's appearance existed, and that the majority opinions here and in the appellate court have "become bogged down in a morass of details." 67 Ill. App. 3d 945, 951.

The totality of the facts and circumstances, known to Acup, justified the arrest. Accordingly, the evidence seized by authorities was also properly admitted by the trial court. I agree that the subsequent confession by—and the lineup identification of—the defendant were admissible. In determining that the arrest was invalid, however, the majority has utilized somewhat tortuous reasoning to uphold the admissibility of the defendant's inculpatory statements. For these reasons, I would affirm the circuit court of Sangamon County; and I dissent in part and concur in part.

MR. JUSTICE RYAN joins in this partial concurrence and partial dissent.