# Illinois Official Reports

## Appellate Court

*In re Jarrell C.*, 2017 IL App (1st) 170932

| | |
|---|---|
| Appellate Court Caption | *In re* JARRELL C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Jarrell C., Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket No. 1-17-0932 |
| Filed | December 11, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-JD-1653; the Hon. William Gamboney, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Lindsay Huge, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Minor respondent Jarrell C. was adjudicated delinquent for committing the offenses of aggravated unlawful use of a weapon and possession of a controlled substance. On appeal respondent argues that the court erred in denying his pretrial motion to suppress the evidence obtained following his illegal seizure by the police. For the following reasons, we reverse the judgment of the circuit court.

¶ 2                                                                  BACKGROUND

¶ 3    At the hearing on respondent's motion to suppress evidence, respondent testified that, on July 22, 2016, he was 18 years old. On that date, at about 8:45 p.m., he was trying to buy a bus card at a currency exchange located at 4400 West Armitage Avenue in Chicago. Respondent referred in his testimony to a video recording taken of him inside the currency exchange. The video was introduced into evidence as minor's exhibit No. 1. Respondent indentified himself in the video and testified he was waiting in line to purchase a bus card. Less than a minute and a half later, a police officer entered the currency exchange.

¶ 4    Respondent indicated that the police officer motioned with his finger for respondent to "come here." Respondent replied "Who me?" The officer said "Yes, you." Respondent stated that the officer had his hand on his gun. Respondent walked over to the officer at that point. Two other officers entered the currency exchange. One of officers told him to lift up his shirt. Respondent replied "What's the problem, sir? [or What's the probable cause, sir?]. I didn't do anything." The officer told respondent to lift up his shirt "before we go over there and do it for you." Respondent lifted up his shirt while turning around. Next, the officers told him to put his hands on the railing so they could search him. One officer unholstered his gun. Another officer searched and recovered a gun from respondent's left side. Respondent was then taken outside to a police car. The police recovered some drugs from his person.

¶ 5    Respondent testified that the officers never indicated that they had an arrest or search warrant for respondent when they called him over at the currency exchange. Respondent stated he was never informed about an arrest warrant and that he was not aware of such a warrant. He stated his hand was never in his waistband.

¶ 6    Officer Brian Ustaszewski testified that on July 22, 2016, at about 8:45 p.m., he was working with Commander Anthony Escamilla and Captain David Harris. While driving in an unmarked car, Officer Ustaszewski was showing the commander and the captain areas of concern in a high-crime area so they could determine where to best deploy resources. He observed respondent standing on Kenneth Avenue in front of a building that is a known Latin Eagles hangout, holding his waistband or the material of his shorts between the waist and the crotch area like he was "holding something" with his right hand. Ustaszewski testified that, in his opinion as an intelligence officer familiar with different areas where street gangs hang out, when people hold their waistbands, they are concealing objects, most likely guns.

¶ 7    Officer Ustaszewski observed respondent for a few minutes and saw him looking in the direction of the officers and then walking inside the currency exchange. The commander and the captain followed respondent inside the currency exchange. Ustaszewski stated that, when he later entered the currency exchange, respondent was talking to the commander "with his hands holding his waistband." The officer asked respondent to lift up the front of his T-shirt,

but respondent only lifted up the back of the shirt slightly and turned around. Ustaszewski could not see the front of respondent. Respondent then turned around and pulled out his shirt, and the officer saw that the shirt "buckled up on the front." Ustaszewski stated that at that point, he knew that respondent had a gun. Ustaszewski testified that he believed respondent was behaving similarly to other gun offenders he had previously arrested based on "the nervousness, the holding of the front waistband, reluct[ance] to lift his shirt up."

¶ 8       Ustaszewski had respondent place his hands on the railing while Commander Escamilla recovered a handgun from respondent's front waistband. On cross-examination, Ustaszewski testified that he saw respondent holding his pants "between the groin area and the waistband" and that it appeared that he was holding something. The officer indicated that he does not always find suspicious activity seeing a young male holding his hand in front of his crotch area like respondent was.

¶ 9       Commander Escamilla testified that, while on patrol with Officer Ustaszewski and Captain Harris on July 22, 2016, at about 8:45 p.m., he saw respondent in front of the currency exchange with "his hand on his waistband." He testified that respondent "did not look like he was holding up his pants." He followed respondent inside the currency exchange. Commander Escamilla asked respondent to approach him, and respondent placed his hands up in the air. Respondent continued to walk forward and Escamilla observed that respondent's hands were "moving around a lot." Escamilla testified that Ustaszewski directed respondent to walk closer and respondent complied. Ustaszewski asked respondent to lift up his shirt a couple of times, but he only lifted the side portion of his shirt.

¶ 10      Escamilla stated that Officer Ustaszewski asked respondent to put his hands on the railing. When respondent complied, Escamilla reached in front of respondent near his waistband and recovered a handgun. Escamilla then placed respondent under arrest. On cross-examination, Commander Escamilla testified that "in many, but not all circumstances" his experience revealed that a person had a gun when holding his hand as he saw respondent holding his.

¶ 11      The State admitted into evidence a certified copy of a previous juvenile arrest warrant for respondent issued by the circuit court on June 6, 2016, pursuant to an unrelated case. There was no evidence presented that any of the officers were aware of the arrest warrant issued by the circuit court before or at the time respondent was stopped and searched.

¶ 12      After closing arguments, the trial court found that respondent holding the area between his waist and crotch did not give the officers a reasonable articulated suspicion to seize respondent. The court held there was an attenuation of the illegal seizure due to the existence of a valid arrest warrant for respondent at the time of the seizure, and the police conduct was not flagrant. The court denied respondent's motion to suppress the evidence.

¶ 13      Subsequently, based on the evidence of the gun and the cocaine recovered from respondent, the court adjudicated respondent delinquent of the aggravated unlawful use of a weapon and possession of cocaine charges and committed him to the Department of Juvenile Justice.

¶ 14                                                    ANALYSIS

¶ 15      In reviewing an order denying a defendant's motion to suppress evidence, mixed questions of law and fact are presented. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004).

Factual findings made by the trial court will be upheld unless they are against the manifest weight of the evidence, while the trial court's application of the facts to the issues presented and the ultimate question of whether the evidence should be suppressed is subject t*o de novo* review. *Id.*

¶ 16    On appeal, respondent argues that the trial court erred in denying his motion to suppress. Respondent contends that the trial court properly determined the investigatory stop was lacking reasonable suspicion but the court erred in its application of the attenuation doctrine. According to respondent, his previous arrest warrant did not attenuate the unlawful detention from the discovery of the evidence when the officers were not aware of the existence of the warrant at the time of the search, before or during the discovery of the gun and the drugs.

¶ 17    In response, the State argues that, unlike what the trial court determined, the facts reveal that the officers had reasonable suspicion to stop respondent. " 'An investigatory stop of a private citizen is allowed only when the police officer has specific, articulable facts which, when taken together with rational inferences, create a reasonable suspicion that the private citizen is involved in criminal activity.' " *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 25 (quoting *People v. Lockhart*, 311 Ill. App. 3d 358, 361 (2000), and citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)); 725 ILCS 5/107-14 (West 2012). Mere hunches and unparticular suspicions are insufficient. *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 25. Although the facts forming the basis of reasonable suspicion need not rise to the level of probable cause and do not require an officer to actually observe the commission of a crime, precedent dictates that the necessary quantum of suspicion exist prior to the stop or detention. *People v. Estrada*, 394 Ill. App. 3d 611, 619 (2009) (construing *Delaware v. Prouse*, 440 U.S. 648 (1979)).

¶ 18    Here, the parties agreed that there was a seizure. Respondent testified that he was waiting in line to buy a bus card when he saw the officers enter the currency exchange. One of the officers told him to lift up his shirt, which he did while turning around. He was told to put his hands on the queue rail and then was patted and searched. Respondent testified that his hand was never in his waistband but was in his pocket or on his crotch area.

¶ 19    Officer Ustaszewski and Commander Escamilla testified that they observed respondent holding onto something between his waist and crotch area. They testified that they formed their belief that respondent was holding a gun based on their previous experience with gun arrestees. On cross-examination, Officer Ustaszewski specified that he is not always suspicious when he sees a young male holding his hand in front of his crotch area like respondent was. Similarly, Commander Escamilla indicated that "in many, but not all circumstances" his experience revealed that a person had a gun if that person was holding his hand as he saw respondent holding his.

¶ 20    Based on the testimony of the parties as well as the video depicting the events that took place inside the currency exchange, the court held that the State lacked a reasonable suspicion to conduct a *Terry* stop. The court determined that the minor "was clutching his waist or crotch area" and cited *In re Rafeal E.*, 2014 IL App (1st) 133027, in support of its holding that the officers lacked a reasonable suspicion that respondent was engaged in any criminal activity when they stopped him.

¶ 21    In *In re Rafeal E.*, two officers were driving in a marked squad car when they observed the respondent and several other individuals standing and talking at the mouth of an alley in a "high narcotics" area. *Id.* ¶ 31. The respondent looked in the officers' direction and then

briskly walked away from the group with his hands in his pockets. *Id.* ¶¶ 5-6. The officers drove up to the respondent and asked him to stop, and the respondent complied. *Id.* ¶ 6. The officer asked the respondent to remove his hands from his pockets, and respondent raised his hands up in the air, revealing a plastic baggie protruding from his waistband. *Id.* We concluded that the encounter was nonconsensual and constituted a *Terry* stop and the police lacked a reasonable, articulable suspicion of criminal activity. We reversed the adjudication of delinquency noting that "[t]here is nothing criminally suspicious about walking down the street with one's hands in one's pockets.*" Id.* ¶ 30.

¶ 22    Similarly here, the officers observed respondent walking in a "high crime area," and the court determined as a matter of fact that respondent was "clutching his waist or crotch area." Just as in *In re Rafeal E.*, there was no evidence presented that respondent was involved in any criminal activity. Respondent was not running away from police. Here, the court noted that the testimony of the minor and of the officers regarding what respondent was holding was "remarkably similar as to what actually occurred—without getting into the difference between the waistband, the waistband and the crotch, and the crotch—these are inches apart." But the mere "holding up [someone's] pants" or "[p]utting something in one's pockets *** is not a hallmark of criminal activity." *Id.* In addition, the video exhibit included in the record on appeal corroborates respondent's testimony that he was not holding his waistband at the time respondent was inside the currency exchange. Based on the totality of the circumstances, we find the court's determination that the officers lacked reasonable suspicion to stop respondent was not against the manifest weight of the evidence. See *In re April C.*, 326 Ill. App. 3d 245, 257 (2001).

¶ 23    Having determined that the officers lacked a valid justification for seizing respondent at that time, we next determine whether respondent's unknown arrest warrant for another offense attenuated the unlawful detention from the discovery of the evidence.

¶ 24    The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. A warrantless search is *per se* unreasonable under the fourth amendment unless one of a few well-established exceptions applies. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016). Those exceptions are known as the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Id.* at ___, 136 S. Ct. at 2061.The attenuation doctrine allows for the admission of evidence obtained unlawfully when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that " 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " *Id.* at ___, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

¶ 25    In *Utah v. Strieff*, the Supreme Court considered whether the discovery of a valid existing warrant is sufficient to break the causal chain between an unlawful stop and the discovery of evidence. *Id.* at ___, 136 S. Ct. at 2062. The Court looked to the three factors espoused in *Brown v. Illinois*, 422 U.S. 590, 602 (1975), for determining whether the attenuation doctrine applied: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of

the official misconduct. *Strieff*, 579 U.S. at ___, 136 S. Ct. at 2062 (citing *Brown*, 422 U.S. at 603-04).

¶ 26 In *Strieff*, a law enforcement officer conducting surveillance on a suspected drug house noticed the defendant exit the house and walk away. *Id.* at ___, 136 S. Ct. at 2060. The officer followed and eventually confronted the defendant in a nearby parking lot. *Id.* at ___, 136 S. Ct. at 2060. Then the officer asked for and received the defendant's identification card and conveyed the information to the police dispatcher. *Id.* at ___, 136 S. Ct. at 2060. A warrant check revealed the defendant had an outstanding warrant, and he was placed under arrest. *Id.* at ___, 136 S. Ct. at 2060. During a search incident to arrest, the officer discovered drugs and drug paraphernalia on the defendant's person. *Id.* at ___, 136 S. Ct. at 2060. The Court found that the discovery of an outstanding arrest warrant was "a critical intervening circumstance" that "broke the causal chain between [an] unconstitutional stop and the discovery of [incriminating] evidence." *Id.* at ___, 136 S. Ct. at 2063.

¶ 27 In the instant case, the trial court found that the first *Strieff* factor—proximity in time—weighed in favor of the respondent. The Supreme Court explained in *Brown* and reiterated in *Strieff* that a short time interval between the illegal detention and the search favored suppression of the evidence. *Id.* at ___, 136 S. Ct. at 2062 (relying on *Brown*, 422 U.S. at 604) (finding that the confession should be suppressed where "less than two hours" separated the unconstitutional arrest and the confession). Here, it is undisputed that only minutes passed between the two events, and therefore, this factor favored respondent. However, the court found that the second and the third *Strieff* factors weighed in the State's favor, and it held that there was an attenuation of the illegal seizure, denying respondent's motion to suppress.

¶ 28 Respondent argues that the trial court erred in its application of *Utah v. Strieff* and challenges the court's application of the second factor—the existence of an intervening circumstance. Respondent attempts to differentiate *Strieff*, arguing that, unlike here, in *Strieff* the warrant's existence became known to officers after illegally stopping Strieff but prior to Strieff's arrest and search incident to arrest.

¶ 29 We agree. In *Strieff*, the officer stopped the defendant without reasonable suspicion and then conducted a warrant check, and based on the warrant he discovered, he arrested defendant. *Id.* at ___, 136 S. Ct. at 2062. The drugs at issue were found pursuant to the search incident to the arrest. *Id.* at ___, 136 S. Ct. at 2062. As a result, the causal chain between the officer's illegal action—the initial, unjustified *Terry* stop—and the search was "broken" by the intervening discovery of the warrant.

¶ 30 Unlike *Strieff*, the instant case presents a different situation. Respondent's unrelated arrest warrant was issued before the illegal stop and the search. But nothing in the record shows that the officers were aware of the warrant before or at the time respondent was detained and searched. Neither Officer Ustaszewski, nor Commander Escamilla investigated or learned of the existence of the warrant after stopping respondent and before searching him. In other words, there were no intervening circumstances between the initial illegal stop and the discovery of the evidence.

¶ 31 Indeed, " ' "[a]n intervening circumstance is one that dissipates the taint of unconstitutional police conduct by breaking the causal connection between the illegal conduct and the [evidence]." ' " *People v. Wilberton*, 348 Ill. App. 3d 82, 86 (2004) (quoting *People v. Austin*, 293 Ill. App. 3d 784, 788 (1997), quoting *People v. Turner*, 259 Ill. App. 3d

- 6 -

979, 993 (1994)). Where an intervening circumstance has been held sufficient to break the causal chain it has been newly discovered information, untainted by illegality. *People v. Jackson*, 374 Ill. App. 3d 93, 105 (2007); see also *Wilberton*, 348 Ill. App. 3d at 88-89 (a codefendant's lawfully obtained statement incriminating the defendant is sufficient to purge the taint of illegality); *People v. Gabbard*, 78 Ill. 2d 88, 99 (1979) (showing defendant a sketch of the man identified as committing the crime was a sufficient intervening circumstance); *In re R.S.*, 93 Ill. App. 3d 941, 946-47 (1981) (showing defendant a stolen clock seized pursuant to a valid search warrant was enough to attenuate illegality). Notably, in all these cases, there was a break in the causal chain prompted by new information or intervening event subsequent to the illegal stop and before the discovery of the evidence. In sharp contrast, here, the arrest warrant, although a valid one, was unknown information to the police at the time of the search and the discovery of the evidence. Accordingly, the arrest warrant did not do anything to attenuate the taint of the illegal stop.

¶ 32    The State cites *United States v. Patrick*, 842 F.3d 540, 555 (7th Cir. 2016), as support for its argument that *Strieff* contains language to suggest that the mere existence of the warrant, regardless of the actual causal chain, constitutes sufficient attenuation. See *id.* at 542 ("[T]he Supreme Court recently held that a valid arrest warrant precludes the suppression of evidence seized in an arrest, even if the arrest was set in motion by officers who had neither probable cause nor knowledge of the warrant. [Citation.] *Strieff* tells us that, if the police had stopped Patrick's car for no reason at all and learned only later that he was a wanted man, the gun would have been admissible in evidence.").

¶ 33    But *Patrick* did not involve or analyze a situation similar to *Strieff* or the instant case. The majority in *Patrick* recognized that, unlike *Strieff*, "[t]he officers who nabbed [defendant], by contrast, had both probable cause to believe that he was a fugitive from justice and knowledge of the arrest warrant." *Id.* Furthermore, the *Strieff* Court clearly stated that the issue addressed in that case was "whether the *discovery* of a valid arrest warrant was a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of drug-related evidence on Strieff's person." (Emphasis added.) *Strieff*, 579 U.S. at ___, 136 S. Ct. at 2061. Unlike *Strieff*, here, the officers did not discover the arrest warrant between the unlawful stop and the discovery of the gun and the drugs. Accordingly, since there was no intervening circumstance to cause a break between the police misconduct and the evidence recovered, we find that the second factor favors suppression of the evidence. We reverse the court's holding on this issue.

¶ 34    Although not determinative in the instant matter since we concluded that two of three factors favored the suppression of the evidence, we will briefly address the third factor a court must consider when determining whether the attenuation doctrine applies—the purpose and flagrancy of the official misconduct. See *id.* at ___, 136 S. Ct. at 2063. "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id.* at ___, 136 S. Ct. at 2063. When an officer's conduct is negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and strongly favors admissibility. *Id.* at ___, 136 S. Ct. at 2063. Good-faith mistakes, resulting from errors in judgment, "hardly rise to a purposeful or flagrant violation of *** Fourth Amendment rights." *Id.* at ___, 136 S. Ct. at 2063.

¶ 35    Illegal arrests have been held to be purposeful and flagrant when undertaken solely to conduct "fishing expeditions" or where the defendant's arrest was accomplished in a manner calculated to cause fright, surprise, and confusion. *People v. Jardon*, 393 Ill. App. 3d 725, 738 (2009) (citing *Brown*, 422 U.S. at 605). In assessing the reasonableness of police conduct, it is incumbent on the court to consider the duty of police to maintain order, prevent crime, and apprehend criminals, often while acting on a quick appraisal of the information known at the time. *Id.* at 738.

¶ 36    Here, the evidence does not reveal that the officers were conducting a fishing expedition. Their stop of respondent was not calculated to cause fright, surprise, and confusion. The evidence suggests that the stop was an isolated instance that occurred in connection with a *bona fide* belief that respondent possessed a gun in his waistband. Accordingly, just as in *Strieff*, the officers' error in judgment does not rise to the level of purposeful or flagrant violation of respondent's rights. This factor is the only one that favors attenuation.

¶ 37    Based on our review of the case, we find that the trial court erred in denying respondent's motion to suppress the evidence. The court determined that the police stop was unjustified and we will not disturb that finding. But respondent's unrelated arrest warrant did not intervene between the stop and the discovery of the evidence, as the police did not know about the arrest warrant before or during respondent's search. Therefore, the court erred when it denied respondent's motion to suppress the evidence obtained as a result of the illegal stop.

¶ 38                                  CONCLUSION

¶ 39    Based on the foregoing, we conclude that the trial court erred in denying respondent's motion to quash arrest and suppress evidence obtained as a result of the illegal stop. *People v. Garcia*, 2012 IL App (1st) 102940, ¶ 17. Because the State cannot prevail on remand without the suppressed evidence, we reverse respondent's adjudication of delinquency. See *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 19.

¶ 40    Reversed.