OPINION
The State of Ohio appeals the trial court's dismissal of one count of theft brought against Defendant-Appellant James N. Couch, Jr., and the court's suppression of certain post-arrest statements made by Couch in which he confessed to two breaking and entering offenses, appearing as the second and third counts of the three-count indictment. The State's appeal is brought pursuant to Crim.R. 12(J). The relevant facts follow.
On June 15, 1998, Detective Mark Salyer of the Dayton Police Department received information from a witness including a description and license plate number of an automobile used to flee the scene of a reported breaking and entering. Salyer ran the license plate number provided by the witness through the police computer, and discovered that the car was registered to Couch. Although Salyer notified the officers in the Second District to be on the lookout for Couch, he did not communicate that information to the officers in the First District.
Very early the next morning, at approximately 1:30a.m., Officers Larry Tolpin and Mark Kinstle of the Dayton Police Department were on patrol in the First District and observed Couch driving his automobile northbound near the 1200 block of Brennan Drive in Dayton, Ohio. According to Officer Tolpin, the right front headlight on Couch's car was not operating, and for that reason, and that reason only, he and his partner pulled Couch over. At the time, Officer Tolpin had no information concerning the owner or the driver of the vehicle and was unaware that a car with a license plate number matching that of Couch's car had reportedly been seen fleeing the scene of a breaking and entering the day before.
After effecting the traffic stop, the officers noticed that Couch was not wearing his seat belt, and he was unable to produce his driver's license upon their request. Officer Tolpin arrested Couch on three traffic violations: failure to display his driver's license, driving with an inoperable headlight, and failure to use his seat belt (hereinafter "the traffic violations"). Following Couch's arrest, the officers conducted an inventory search of Couch's car prior to having it towed and found a water pump and lawn equipment in the back seat of the car. Because Tolpin and Kinstle knew one of their fellow officers, C. J. Carlson, was involved in an investigation involving stolen tools, they contacted her by radio. She indicated she was on her way to the Pepsi Cola Bottling Company (hereinafter "Pepsi") where a water pump had just been stolen. Officer Carlson contacted the Pepsi complainant and brought him to the scene, whereupon he positively identified the water pump as the one stolen from Pepsi, Couch's car as the one used in the theft, and Couch as the individual he saw steal the water pump from the Pepsi plant loading dock. Couch's automobile was then towed to the storage lot at Andy's Towing, and Couch was transported to the police station.
In the meantime, Detective Salyer had been contacted by another officer who told him Couch had been arrested on traffic violations in the First District. Salyer proceeded to the police station where Couch was being held and interviewed him after Couch indicated an understanding and waiver of his Miranda rights. Couch subsequently admitted he had stolen the water pump from Pepsi. Salyer also questioned Couch about two breaking and enterings that took place on June 11 and 12, 1998, and Couch admitted involvement in those offenses as well. All three statements were made by Couch sometime before 3:45a.m. on the morning of his arrest.
On July 21, 1998, a hearing was held in the Dayton Municipal Court pursuant to Couch's motion to suppress evidence on the traffic violations on grounds that the stop was illegal. Evidence was produced indicating the headlight on Couch's car had not been inoperable when Couch was stopped and subsequently arrested, as the officers had claimed. Judge Alice McCollum found the stop was illegal and granted Couch's motion to suppress. Thereafter the City of Dayton withdrew the traffic violation charges.
On August 4, 1998, Couch filed a second motion, this time in the Common Pleas Court of Montgomery County, requesting suppression of evidence flowing from his illegal arrest as it related to the theft and breaking and entering charges in the indictment. The following month, Couch moved to dismiss the indictment on grounds that the evidence against him, specifically the fact that the water pump was found in his possession and his confessions to the breaking and entering offenses, was the result of the illegal arrest. Couch claimed that Judge McCollum's decision had res judicata effect as to the illegality of the stop and subsequent arrest, that evidence collected as a result of the illegal stop should consequently be suppressed, and that since the State had no other evidence against him, the indictment should be dismissed.
A hearing was held in the Montgomery Common Pleas Court on October 1, 1998 for the purpose of clarifying the issues before the court, and for the parties to stipulate to the admission of Tolpin's and Salyer's statements into the record. The court ruled on Couch's motions to dismiss and suppress on November 10, 1998, finding, in relevant part, as follows:
 This Court finds that there is only token opposition by the State as it relates to the Motion to Dismiss Count One of the Indictment. It is uncontroverted that Judge Alice McCollum, Dayton Municipal Court, held a Motion hearing and subsequently ruled that the original stop of the Defendant was without valid reason or probable cause. That Court determined that the reason for the original traffic stop was without merit and granted the defendant's Motion to Suppress. Case No. 98-TRD-11676, Dayton Municipal Court.
This Court accepts the Defendant's argument that the doctrine ofres judicata applies and, therefore, SUSTAINS Defendant's Motion to Dismiss Count One of the Indictment. The Court cannot find that the doctrine of res judicata applies to Counts Two and Three of said Indictment and hereby OVERRULES Defendant's Motion to Dismiss said Counts Two and Three. However, this Court herebySUSTAINS Defendant's Motion to Suppress the statements made by the Defendant relating to Counts Two and Three of the Indictment. The State's argument on this issue is sophisticated and well reasoned but to apply that legal argument to the raw facts of this case is simply too far reaching and requires significant "fine-tuning." In addition, a decision to the contrary could obviously lead to considerable abuse by law enforcement officers when faced with similar "easy pickens." Therefore, the Court mustSUSTAIN Defendant's Motion to Suppress all statements as they relate to Counts Two and Three of the Indictment.
The State filed a timely notice of appeal pursuant to Crim.R. 12(J), and advances three assignments of error before this court. First, the State claims there was preexisting probable cause for Couch to be detained on the breaking and entering charges. Next, it contends res judicata was improperly applied by the trial court. In its final assignment of error, the State argues that the evidence that the pump was found in Couch's possession should not have been suppressed. For purposes of analytical ease and coherence, we will address the State's second assignment of error first, followed by the first and third assigned errors.
The State's second assignment of error is as follows:
 Res judicata is inappropriate to matters in which the subject matter of a prior adjudication is different from the matter presently before the court.
 In the State's brief argument under its second assignment of error, it claims that the trial court's dismissal of the theft offense based on the res judicata effect of the Municipal Court's dismissal of the traffic offenses was an improper application of the doctrine. The State's argument, however, appears to be based on a misconception of either the doctrine of res judicata itself or the trial court's decision.
"The doctrine of res judicata holds that an existing final judgment or decree, rendered upon the merits, is conclusive of rights, questions, and facts in issue, as to their parties and privies, in all other actions or suits in the same or any other judicial tribunal of concurrent jurisdiction." State v. Cook
(Sept. 20, 1991), Montgomery App. No. 12465, unreported, citingWright v. Schick (1938), 134 Ohio St. 193, 198. Complete identity of parties and issues must exist for the doctrine to be applicable. Id. In addition, for relitigation of an issue to be precluded in a second action, it must have been actually and necessarily litigated and determined in the first action.Whitehead v. Gen. Tel. Co. (1969), 20 Ohio St.2d 108, 112, overruled on other grounds, Grava v. Parkman Twp. (1995), 73 Ohio St.3d 379,382. Here, the State does not contest that the parties in the Municipal Court case and the present case are the same for purposes of res judicata analysis, nor does it claim that the illegality of Couch's stop was an issue that was not actually and necessarily litigated and determined in the Municipal Court. Instead, the State's argument rests on a perceived difference between the issue decided in the Municipal Court and the issue before the trial court.
In its brief, the State contends the issues before the Municipal Court and trial court were different, as one pertained to Couch's traffic offenses and the other to the theft offense. The issue before the Municipal Court, however, was not whether Couch was guilty of the traffic violations alleged, but whether the police officers' stop of Couch was reasonable. In the trial court, the question was whether the evidence gathered with respect to the water pump and its discovery in the back seat of Couch's car should be suppressed as "fruit of the poisonous tree." In that respect, the issue of the illegality of Couch's stop and subsequent arrest was res judicata, and was properly found to be so by the trial court. Put another way, the trial court could not revisit the issue of the propriety of the officers' stop and arrest of Couch; that issue was barred by the doctrine of resjudicata. The only question remaining before the trial court, therefore, was whether the evidence concerning the theft of the pump was suppressible as "fruit of the poisonous tree," which the court determined it was.
Furthermore, while the trial court's choice of words in its decision is less than exact, a reasonable reading of it leads one to the understanding that the trial court found the issue of the illegality of Couch's stop to be res judicata, and that because the State put forth "only token opposition" to Couch's motion to dismiss on the theft count, the court granted dismissal as to that count rather than merely suppressing the evidence flowing from the illegal arrest. The State's argument that the trial court erroneously found the Municipal Court's decision as to the propriety of the officers' initial stop of Couch as having someres judicata effect on the merits of the theft charge appears to be a product of the State's misunderstanding of the trial court's findings.
At oral argument before us, in fact, the State claimed to have "no real quarrel" with the trial court's application of resjudicata to the extent that it was applied to the illegality of the stop. Instead, the State argued that dismissal of the count was inappropriate, and that a proper result would have been suppression of the evidence relating to the theft offense. Apart from one sentence in its second assignment so stating, which actually is more of an aside, this issue was not presented to us for review as a separate assignment of error. Nevertheless, because the argument was made, albeit in a condensed fashion, and because we find it persuasive even in its exquisite brevity, we will address its merits.
Couch's motion to dismiss the indictment was brought pursuant to Crim.R. 12 which permits certain defenses, objections, evidentiary issues, etc., to be brought prior to trial. "Only matters capable of determination without the trial of the general issue may be raised by pretrial motions. Crim.R. 12(B)." Statev. O'Neal (1996), 114 Ohio App.3d 335, 336. In Ohio, there is no provision for a motion to dismiss a criminal case based on the lack of probable cause. State v. Hartley (1988), 51 Ohio App.3d 47,48. In addition, in State v. Patterson (1989), 63 Ohio App.3d 91,95, we explained that "a motion to dismiss charges in an indictment tests the sufficiency of the indictment, without regard to the quantity or quality of evidence that may be produced by either the state or the defendant." Consequently, the proper determination for a trial court confronted with a motion to dismiss an indictment is whether the allegations contained in the indictment make out offenses under Ohio criminal law. Id. If they do, it is premature for the court to determine before trial whether the State could satisfy its burden of proof with respect to the those charges, and the motion to dismiss should be overruled. Id.
The basis for Couch's motion to dismiss the indictment was not that the indictment failed to describe offenses under Ohio criminal law, however. Rather, Couch claimed he was entitled to dismissal because the State would be left with no evidence with which to prosecute him if he was successful on his motion to suppress his confessions and the fact that the stolen water pump had been discovered in the back seat of his car. The trial court, whether for the reasons advanced by Couch, or because the State put forth "only token opposition" to dismissal of the theft count, granted Couch's motion on that count. Either way, it was error.
Whether the State had evidence sufficient for a successful prosecution is not a question that should have, or could have, been answered by the trial court pursuant to a pre-trial motion. First of all, the State is under no obligation to set out all the evidence at its disposal upon a defendant's motion to dismiss. Second, we note that the State did submit arguments against dismissal of the indictment in its memorandum contra Couch's motion to dismiss. The paucity of any additional argument by the State on that issue is likely due to the trial court's statements at the October 1 hearing that it "would not be spending an awful lot of time dealing with the issue on Count One," and that the parties should "[f]ocus on the issue of [Couch's] * * * statement as it relates to Counts Two and Three" in their supplemental filings. Also at the hearing, the prosecutor resisted Couch's attorney's attempts to coax him into consenting to dismissal of the theft charge if the court determined suppression of the evidence relating to that charge was appropriate, stating instead that the State was "not going to concede Count One."
In summary, we conclude that, as the State conceded at oral argument, res judicata was properly applied by the trial court to the issue of the illegality of Couch's stop by police, and that suppression of the evidence pertaining to the water pump theft charge was therefore proper. We also find, however, that dismissal of count one of the indictment was error. There is no basis under the Rules of Criminal Procedure for dismissal of an indictment, or any count in an indictment, so long as the indictment makes out an offense under the Ohio criminal law. That some of the State's evidence is subject to suppression does not provide a basis for dismissal. While the State may have a tougher row to hoe without the availability of the suppressed evidence, it does not necessarily follow that, as a matter of law, the defendant is entitled to dismissal of the charge. Therefore, we overrule the State's second assignment of error insofar as it claims erroneous application of res judicata and improper suppression of the evidence pertaining to count one of the indictment. The assigned error is sustained to the extent that it contends suppression, rather than dismissal, was the appropriate remedy.
The State's first assignment of error is as follows:
 The Exclusionary Rule does not bar the use of a subsequent Mirandized confession where probable cause existed to justify the arrest.
In its first assignment of error, the State argues that the United States Supreme Court case of New York v. Harris (1990),495 U.S. 14, applies to the facts of this case and renders Couch's confessions to the breaking and entering offenses admissible. TheHarris case stands for the proposition that legal custody of a defendant may follow from an illegal arrest under certain circumstances, without release and rearrest, and that a confession obtained during such legal custody is admissible evidence. A brief review of Harris and its predecessors is helpful.
The Supreme Court of the United States first dealt with the issue of confessions as a fruit of an illegal arrest in Wong Sunv. United States (1963), 371 U.S. 471. There, the Court held that a statement made to police after the police broke down the door to a laundry business, pursued the laundry owner into the attached living quarters, handcuffed him, and arrested him, all without probable cause or a warrant, was the fruit of an illegal invasion and suppressible. A second defendant in the case later returned to the police station voluntarily after being released on his own recognizance and gave an unsigned confession. His confession was held by the Court to be so attenuated from his illegal arrest as to dissipate the taint. Citing Nardone v. United States (1939),308 U.S. 338 and Maguire, Evidence of Guilt, 221 (1959), the Court stated as follows:
 We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
The next significant step in the development of the law concerning confessions following illegal arrests was Brown v.Illinois (1975), 422 U.S. 590. Brown was arrested as he was returning home by two officers who had forcibly entered his apartment and searched it, again, all without probable cause and without a warrant. He was transported to the police station where he was warned of his rights under Miranda, and questioned about a murder that occurred a week earlier. About an hour after his arrest, Brown signed a written statement implicating him and another person in the murder. After searching for and apprehending the other person implicated, the police returned to the station and Mirandized Brown two more times. Brown gave another statement which, in all important respects, duplicated his first, but he refused to sign it. At trial, and over his objection, Brown's two statements were admitted into evidence and he was convicted of murder. The Supreme Court of Illinois upheld the conviction notwithstanding the fact that it found Brown's arrest unlawful for lack of probable cause. The state court reasoned that the giving of Miranda warnings broke the causal connection between the illegal arrest and the statements, and that the statements were "`sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" Id. at 597, quotingWong Sun, supra at 486.
The Supreme Court rejected the per se rule adopted by the Illinois court, explaining as follows:
 Although, almost 90 years ago, the Court observed that the Fifth Amendment is in `intimate relation' with the Fourth, * * * the Miranda
warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. * * * The exclusionary rule, * * * when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.
 Brown, supra at 601. In a footnote, the Court also noted that the Miranda warnings do not inform a person of his Fourth Amendment rights, including his right to be released from custody after an arrest that was unlawful because it was made without probable cause. Id. at fn. 6.
In Brown, the Court stated that the giving of Miranda
warnings, though relevant to a determination of whether a confession was obtained by exploitation of the illegal arrest, was not dispositive. Id. at 603. Once it is determined, as a threshold matter, that the confession was voluntary, a court must consider whether the confession was so attenuated from the illegal arrest as to purge it of the primary taint. Id. at 603-4. The temporal proximity of the confession to the illegal arrest, whether there were any intervening circumstances that served to separate the confession from the illegal arrest, and the purpose and flagrancy of the official misconduct are relevant factors to be considered in deciding the admissibility of the confession.Id. In articulating this multi-factored test, the Court rejected a "but for" approach to admissibility of a confession following an illegal arrest, and recognized that "persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." Id. at 603. In Brown's case, two hours had passed between the time of his illegal arrest and his confession, and the Court found the illegal conduct by the police purposeful. Therefore, Brown's confessions were suppressed.
In a later case, the Court considered the admissibility of a defendant's incriminating statments made after he had been ostensibly arrested at a neighbor's house without probable cause or a warrant, taken to the police station, Mirandized, and interrogated. Dunaway v. New York (1979), 442 U.S. 200. The facts in Dunaway were found by the Court to be "virtually a replica of the situation in Brown." Id. at 218. The state appellate division distinguished the two cases by noting that in Dunaway, the police did not threaten or abuse Dunaway, and were "highly protective of defendant's Fifth and Sixth Amendment rights." Id. at 218-19 (cite omitted). The Court rejected the state court's reasoning, emphatically stating that "[s]atisfying the Fifth Amendment is only the `threshold' condition of the Fourth Amendment analysis required by Brown." Id. at 219. As no intervening events broke the connection between Dunaway's illegal detention and his confession, the Court held his statements inadmissable.
The Court applied the Brown factors again in Taylor v.Alabama (1982), 457 U.S. 687, and concluded that Taylor's arrest without probable cause or an arrest warrant on an uncorroborated tip from an informant, the search of Taylor's person, his involuntary transportation to the police station, and subsequent interrogation produced an inadmissible confession. Although Taylor's confession was separated from his illegal arrest by six hours, during which an arrest warrant was belatedly obtained, he was Mirandized three times, and was permitted to visit with his girlfriend, the Court found the confession inadmissible underBrown for lack of attenuation between the arrest and confession.
It was with this background that the Court approached the case of New York v. Harris, supra, in 1990. Harris was arrested in his home after being Mirandized, transported to the police station, re-Mirandized, and subsequently gave a written inculpatory statement[1] The Court began by observing that "[t]he sole issue in this case is whether Harris' * * * statement * * * should have been suppressed because the police, by entering Harris' home without a warrant and without his consent, violatedPayton v. New York, 445 U.S. 573 (1980), which held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Harris, supra at 16.
The Court distinguished the situation in Harris from those inBrown, Dunaway, and Taylor in that the police had probable cause to arrest Harris before they arrested him illegally. In so doing, the Court stated the following:
 In each of those cases, evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause. The three cases stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. See also Wong Sun v. United States, 371 U.S. 471 (1963). We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that "the challenged evidence is in some sense the product of illegal governmental activity." (Cite omitted.) As Judge Titone, concurring in the judgment on the basis of New York state precedent, cogently argued below, "[i]n cases such as Brown * * * and its progeny, an affirmative answer to that preliminary question may be assumed, since the `illegality' is the absence of probable cause and the wrong consists of the police's having control of the defendant's person at the time he made the challenged statement. In these cases, the `challenged evidence — i.e., the post arrest confession — is unquestionably `the product of [the] illegal governmental activity' — i.e., the wrongful detention." (Cite omitted.)
Harris, supra at 18-19.
The nature of the illegality in Harris' case was that the police entered Harris' home without his consent or a warrant, and absent any exigent circumstances to effectuate his arrest. Upon entry, they Mirandized Harris, arrested him, transported him to the police station, re-Mirandized him, and obtained a written inculpatory statement signed by Harris. The Court found the statement admissible because it was not obtained by an exploitation of the illegal entry into Harris' home. Id. at 19. Rather, once Harris had been removed from his home, the preexisting probable cause provided a legitimate basis for his arrest, without release and rearrest, and any statement thereafter made by Harris, the Court reasoned, was not the fruit of his having been arrested in his home rather than someplace else. Id. at 20. The holding of the case was cogently stated in the last paragraph of the majority opinion: "[W]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." Id. at 21. Essentially, the Court held that, at least in situations where the constitutional infirmity rendering an arrest illegal is a violation of the rule in Payton, removal of a suspect from the place protected by Payton and the giving of Miranda warnings will purge any subsequent statements by the suspect of the taint of the illegal arrest.
According to the State, the question to be answered in this case is whether probable cause to arrest a suspect on charges unrelated to the initial arrest, existing but unknown to the arresting officers, in conjunction with transportation of the suspect away from the place of the consititutional violation and the giving of Miranda warnings, results in attenuation sufficient to purge the taint of the illegality from a confession. We find the State's arguments both difficult to follow and undeveloped, but ultimately convincing. In addition, application of the Brown
factors to the facts in this case persuades us that suppression of Couch's post-arrest confessions to the two breaking and entering charges was erroneous.
The State begins its argument by claiming that Couch would have been arrested or at a minimum questioned about the theft of the water pump because he had been seen leaving the scene of an unrelated breaking and entering the day before the water pump was reported stolen. This argument is purely speculative. Just because the police might have eventually paid Couch a visit based on the information provided by the witness to the breaking and entering offense, namely the make, model, and license plate number from Couch's car, that does not necessarily lead to the conclusion that the police would have inevitably questioned Couch about the water pump as well. In addition, since Couch was, at the time of his arrest, attempting to sell the stolen pump, there is no reason to think that it would have been in Couch's possession if and when the police eventually came to call on him.
The State also seems to make the argument that because the constitutional violation that rendered Couch's arrest illegal occurred at the place of his arrest (stopping him without reason or probable cause), the subsequent removal of Couch from that place (taking him to the police station) removed the taint of the illegal arrest from Couch's subsequent statements. In so arguing, the State attempts to analogize the present facts to those inHarris, supra. On the basis argued, however, Harris is, in our view, distinguishable. Removal from the place of the constitutional violation in Harris was significant since the police conduct was illegal because of the place in which it wasconducted, and for no other reason. The same is not true in the present case. The illegality of Couch's arrest had nothing whatsoever to do with the fact that it was effected in the 1200 block of Brennan Drive in Dayton, Ohio. Therefore, removing Couch from that location does nothing to purge the taint of his illegal arrest from the confessions he later made.
We note that the flaw in the State's argument may be rooted in its misquotation of State v. Shepard (Feb. 26, 1993), Lucas App. No. L-91-319, unreported, which paraphrased Harris. The State claims that the following is a quotation from Shepard, which in turn cited Harris: "Where the constitutional violation occursin the place of arrest, the violation stops when the suspect is removed from the home, and a subsequent confession is not inadmissible solely because it violated the Payton rule." (Emphasis added.) In Shepard, however, the passage actually reads "[w]here the constitutional violation lies in the place of thearrest, * * * " (emphasis added), which, though the difference is subtle, is more in line with the holding in Harris. We are certain that neither the Supreme Court nor the Court of Appeals of Ohio for the Sixth District intended to create a blanket rule that the police could cure a constitutional violation in all cases by simply removing the illegally arrested individual from the scene of his or her arrest, and we decline to invent such a rule now in spite of the State's encouragement for us to do so.
Nevertheless, analysis under Brown and its progeny, includingHarris, leads us to conclude that suppression of Couch's confessions to the two breaking and entering offenses was erroneous. As was stated earlier, voluntariness of a confession subsequent to an illegal arrest is a threshold matter. Couch has not claimed that his confessions were in any way coerced or the product of his will being overborne by the police. Furthermore, his brief contains no claim that his statements were made without proper advisement of his Miranda rights. Thus, the voluntariness of Couch's statements having not been raised as an issue for our review, we proceed to consider the other factors deemed relevant by the Supreme Court to a determination of whether a confession is sufficiently attenuated from the illegal arrest as to purge the statement of the taint of the illegality.
Accordingly, we turn our attention to the issue of the temporal proximity of Couch's confession to his illegal arrest. From the record, it appears that approximately two hours passed between the time Couch was initially pulled over by Officers Tolpin and Kinstle and his confession to the breaking and entering offenses under interrogation by Detective Salyer. The same period was found to be insufficient time for the taint of the illegal arrest to dissipate in Brown. While there is no bright line rule, generally the shorter the time lapse between the illegal arrest and the suspect's confession, the more likely it is the court will find that the taint retains its potency. See, e.g., 5 LaFave, Search and Seizure (1996) 258-61, Section 11.4(b). In our view, the passage of two hours between Couch's detention and confession tends to support Couch's argument that his statements were not free of the taint of his illegal arrest.
The next factor to be considered concerns any intervening circumstances that may have served to separate the confession from the illegal arrest. Put another way, we must look to whether there was a causal connection between Couch's illegal arrest and his subsequent confessions. We have already dispensed with the State's argument that the transportation of Couch to the police station was an intervening circumstance sufficient to break the causal connection between his arrest and his confessions, finding it not to be so. In addition, it is quite clear that, while relevant to the threshold question of voluntariness, giving a suspect Miranda warnings after an illegal arrest does not result in the degree of attenuation necessary to purge a subsequent confession of the initial taint. Brown, supra at 601-3. Therefore, in order for Couch's confessions to be admissible, there must exist some other intervening circumstances attenuating them from the illegal arrest.
The State appears to argue that probable cause is more or less fungible between an officer who possesses information constituting probable cause and an arresting officer completely unaware of that information, the implication being that the metaphysical leap of probable cause from one officer to the other constitutes an intervening and attenuating circumstance. The State, however, cites no authority for its position, and we are aware of none. In fact, the same argument has been consistently rejected in several courts. See 2 LaFave, Search and Seizure (1996) 265-70, Section 3.5(c). We are similarly unpersuaded. While the Ohio Supreme Court has recognized that information supplied by officers engaged in a common investigation with an arresting officer may be used to establish probable cause, Statev. Henderson (1990), 51 Ohio St.3d 54, syllabus, that holding falls far short of an endorsement of the proposition, advanced here, that probable cause possessed by an officer other than the arresting officer can be imputed to an arresting officer who is wholly unaware of the fact that a crime has been committed and the arrestee's status as a suspect for that crime.
Nevertheless, we find that, to the extent that Detective Salyer's interrogation of Couch was based on the information he acquired from the witness to the June 15 breaking and entering, Couch's confessions to the two breaking and entering offenses were separated from his illegal arrest and provided a valid justification for his continued detention. Detective Salyer's questioning of Couch on the breaking and entering offenses was precipitated by Salyer's awareness of evidence implicating Couch that was developed independent of and prior to Couch's illegal arrest. Here, as in Harris, supra, it was not necessary for Couch to be released from the illegal arrest then immediately rearrested, with probable cause, on charges of breaking and entering.
Finally, we consider the last Brown factor, the purpose and flagrancy of the official misconduct. We find two cases, one from Illinois, the other from Florida, to be enlightening and useful to our analysis. In Illinois v. Gabbard (Ill. 1979), 398 N.E.2d 574, and Voorhees v. Florida (Fla. 1997), 699 So.2d 602, the facts were similar to those presented here. A suspect was illegally arrested by an officer having no probable cause. Unbeknownst to the arresting officers, the suspect in each case was wanted on charges unrelated to the illegal arrest. Under interrogation by an officer other than the arresting officer, the suspects confessed to the unrelated offenses. The only significant difference between the facts in the the present case and the facts in Gabbard
and Voorhees is that in those cases, the arresting officers and the officers possessed of probable cause were employed by different police departments. In our view, however, this fact alone is not dispositive.
In Gabbard, the court found the suspect's subsequent confession on an unrelated robbery offense admissible, reasoning as follows:
 The unlawful arrest of the defendant was thus not made in the course of an investigation into the robbery or for the purpose of interrogating the defendant on that subject. Neither the arresting officer nor the governmental entity by which he was employed was investigating that crime or was responsible for doing so, and the arresting officer was not even aware that [the robbery] * * * had occurred. The interrogating officer, on the other hand, knew that the defendant was in custody as the result of having escaped from an institution, and while also aware that the defendant had been found in possession of articles stolen in the robbery, he did not know the circumstances leading to the defendant's arrest.
Gabbard, supra at 578-79. The Voorhees court agreed with the reasoning and result of Gabbard, and also noted that the purpose of the exclusionary rule's theory of deterrence was not thwarted by admission of the suspect's post-arrest confession to an offense unrelated to his initial arrest. The court made the following observation:
 Very few officers would illegally arrest a suspect on the off chance that the officer for another police force, investigating a different crime, might later interrogate the suspect and obtain a confession. It is much more likely, however, that an officer would illegally arrest a suspect in the hope that an interrogating officer of the same force, investigating the same crime and conveniently left unaware of the illegality, might obtain the suspect's confession.
Voorhees, supra at 612, quoting Illinois v. White (Ill. 1987),512 N.E.2d 677, 689-90.
We find the courts' reasoning is equally applicable in the instant case, in spite of the fact that Officers Tolpin and Kinstle and Detective Salyer were all employed by the Dayton Police Department. That the two officers and the detective are employed by the same police department does not overcome the fact that the conduct of the arresting officer was neither motivated by nor connected with the detective's investigation of the unrelated offense. In addition, we find nothing in the record to suggest that Detective Salyer was aware of or exploited the illegality of Couch's initial arrest. In fact, Detective Salyer derived no advantage from Couch's arrest other than receiving reliable information as to Couch's whereabouts at that particular moment in time. While Salyer's interrogation of Couch was arguably made easier because of Couch's known location, and might even have taken place earlier than it would have without Couch's illegal arrest, in our view, such does not amount to exploitation of the illegal arrest.
In summary, we find that the arresting officers had no knowledge of Couch's status as a suspect in the two breaking and entering offenses, and the interrogating officer was similarly unaware of the illegality of the arrest. The illegal arrest was not initiated by Officers Tolpin and Kinstle in the hopes of extracting from Couch confessions to the breaking and entering offenses. Couch was properly Mirandized before being interrogated on the breaking and entering offenses which were unrelated to the initial arrest, and Detective Salyer had probable cause to arrest Couch on those charges, had he not already been in custody. Detective Salyer's probable cause arose from evidence developed wholly independent of the illegal stop. These facts coalesce to break the causal connection between Couch's arrest and subsequent statements concerning breaking and entering offenses. That his confessions followed his illegal arrest by only two hours does not negate our finding that the confessions were sufficiently attenuated from the arrest so as to purge from them the taint of the initial illegality. We conclude that Couch's statements concerning the two breaking and entering offenses are admissible as evidence, and the trial court's finding to the contrary was error.
At last, we turn to the State's third assignment of error, which is as follows:
 Derivative evidence will not be suppressed when it is discovered pursuant to an independent source.
In its third assignment of error, the State argues that the Pepsi employee's description of Couch and his car provided an independent source for discovery of the stolen water pump in Couch's back seat. Oddly enough, the State contends that discovery of the water pump in Couch's car was derived from the Pepsi employee's identification of Couch at the scene of Couch's arrest. The record leaves no doubt, however, that discovery of the water pump and other tools in Couch's car preceded Officer Tolpin's radio call to Officer Carlson, who in turn brought the witness to where Couch was arrested for the witness' identification of Couch as the man who stole the pump. The State's claim that one event can be derivative of a subsequent event quite frankly mystifies us.
The State also cites State v. Myers (1997), 119 Ohio App.3d 376, as support for its claim. There, we explained that evidence that is not discovered during an initial illegal search, but is instead discovered later, and pursuant to a valid search warrant issued on information disconnected from the prior illegality, is derivative evidence from an independent source and should not be suppressed. Id. at 382. We fail to see how Myers supports the State's claim that information acquired after an illegal search may act as a retroactive antidote and render the poisonous fruit pristine.
In fact, while the State purports to advance an independent source argument, what it really does is contend that the water pump would inevitably have been discovered in the back seat of Couch's car once the police had an opportunity to follow up on the information provided by the witness. Nowhere is it demonstrated, however, that the water pump was destined to remain in the back seat of Couch's car for any particular or ascertainable period of time. On the contrary, in his statement Detective Salyer noted that Couch told him at the time he was stopped by Officers Tolpin and Kinstle, he was in the process of trying to sell the pump. There is every likelihood, therefore, that the pump would have been disposed of before it could have been discovered in Couch's car. Furthermore, Officer Tolpin's statement does not indicate that the witness to the theft provided a description of Couch or his car to the police before the witness was brought to the scene of the arrest to identify Couch. Thus, there is no basis upon which to conclude that the investigation of the pump theft would invitably have led them to suspect Couch and discover the pump.
We find the State's third assignment of error to be without merit and it is accordingly overruled.
In conclusion, we have found merit in the State's second assignment of error insofar as it contends dismissal of count one of the indictment was improper, and that suppression of the evidence relating to that count was appropriate. To that extent, it is sustained. The State's arguments concerning the propriety of the trial court's application of the doctrine of res judicata
is overruled for the reasons stated herein. In addition, the State's first assignment of error claiming suppression of Couch's confessions to the two breaking and entering offenses was error is also sustained. The third assignment of error is overruled. Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and we remand this matter to the trial court for further proceedings consistent with this opinion.
. . . . . . . . . .
GRADY, P.J. and WOLFF, J., concur.
Copies mailed to:
George A. Katchmer
John H. Rion
Hon. John W. Kessler
[1]Although other incriminating statements were taken from Harris both before and after the one at issue before the Supreme Court, their inadmissibility was conceded and they are, for present purposes, irrelevant.